**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| KRISTEN BIEL,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>ST. JAMES SCHOOL, A CORP., a<br>California non-profit corporation;<br>DOES, 2–50, inclusive; ST. JAMES<br>CATHOLIC SCHOOL, a California non-<br>profit corporation; DOE 1,<br>*Defendants-Appellees*. | No. 17-55180<br><br>D.C. No.<br>2:15-cv-04248-<br>TJH-AS<br><br><br>ORDER |

Filed June 25, 2019

Before: D. Michael Fisher,* Paul J. Watford,
and Michelle T. Friedland, Circuit Judges.

Order;
Dissent by Judge R. Nelson

---

*The Honorable D. Michael Fisher, United States Circuit Judge for the U.S. Court of Appeals for the Third Circuit, sitting by designation.

## SUMMARY[**]

### Employment Discrimination

The panel denied a petition for panel rehearing and, on behalf of the court, a petition for rehearing en banc following the panel's opinion reversing the district court's summary judgment in an employment discrimination action under the Americans with Disabilities Act.

In its opinion, the panel held that the First Amendment's ministerial exception to generally applicable employment laws did not bar a teacher's claim against the Catholic elementary school that terminated her employment.

Dissenting from the denial of rehearing en banc, Judge R. Nelson, joined by Judges Bybee, Callahan, Bea, M. Smith, Ikuta, Bennett, Bade, and Collins, wrote that the panel's opinion embraced the narrowest construction of the ministerial exception, split from the consensus of other circuits that the employee's ministerial function should be the key focus, and conflicted with the Supreme Court's decision in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171 (2012).

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## ORDER

The panel has voted unanimously to deny the petition for panel rehearing. Judge Fisher recommends granting the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc. A judge of the court requested a vote on en banc rehearing. The matter failed to receive a majority of votes of non-recused active judges in favor of en banc consideration. Fed. R. App. P. 35(f).

The petition for rehearing and the petition for rehearing en banc are **DENIED**.

---

R. NELSON, Circuit Judge, with whom BYBEE, CALLAHAN, BEA, M. SMITH, IKUTA, BENNETT, BADE, and COLLINS, Circuit Judges, join, dissenting from the denial of rehearing en banc:

By declining to rehear this case en banc, our court embraces the narrowest construction of the First Amendment's "ministerial exception" and splits from the consensus of our sister circuits that the employee's ministerial function should be the key focus. The panel majority held that Kristen Biel, a fifth-grade teacher who taught religion and other classes at a Catholic school, was not a "minister" because the circumstances of her employment were not a carbon copy of the plaintiff's circumstances in *Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 565 U.S. 171, 196 (2012). *See Biel v. St. James Sch.*, 911 F.3d 603 (9th Cir. 2018). The panel majority's approach conflicts with *Hosanna-Tabor*, decisions from our court and sister courts, decisions from state supreme courts, and First Amendment principles. And

it poses grave consequences for religious minorities (collectively, a substantial plurality of religious adherents in this circuit) whose practices don't perfectly resemble the Lutheran tradition at issue in *Hosanna-Tabor*.

This is precisely the case warranting en banc review. We adopted the ministerial exception en banc prior to *Hosanna-Tabor*. *See Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288 (9th Cir. 2010) (en banc). The ministerial exception "is undeniably an issue of exceptional importance" because its denial "portends serious consequences for one of the bedrock principles of our country's formation—religious freedom." *Bollard v. Cal. Province of the Soc'y of Jesus*, 211 F.3d 1331, 1333 (9th Cir. 2000) (Wardlaw, J., joined by Kozinski, O'Scannlain, and Kleinfeld, JJ., dissenting from denial of rehearing en banc).

Since then, the Supreme Court unanimously upheld the ministerial exception in *Hosanna-Tabor*, suggesting its application in a case like this. Three Justices—Thomas, Alito, and Kagan—filed or joined two separate concurrences specifically proposing legal tests under which the ministerial exception plainly applies here (and no Justice has proposed a test undermining its application here). And virtually all our sister courts—and state supreme courts—adopted the ministerial exception in similar cases.

In this case, five different amici—coalitions of religiously diverse organizations and law professors—urge this court to correct its legal error. As amici explain, the panel majority's approach trivializes the significant religious function performed by Catholic school teachers. This court's narrow construction of the exception threatens the autonomy of minority religious groups, like amici, "for whom religious education is a critical means of propagating the faith, instructing the rising generation, and instilling a

sense of religious identity." Brief of Gen. Conference of Seventh-Day Adventists, Int'l Soc. for Krishna Consciousness, Inc., Jewish Coalition for Religious Liberty, and Shaykh Hamza Yusuf as Amici Curiae in Support of Rehearing and Rehearing En Banc at 2.

In light of all this, where does our court now stand on the ministerial exception? Despite a unanimous Supreme Court opinion upholding the exception, we are weaker, not stronger, in applying it. Not once, not twice, but three times now in the last two years, we have departed from the plain direction of the Supreme Court and reversed our district courts' faithful application of Supreme Court precedent. *See also Puri v. Khalsa*, 844 F.3d 1152 (9th Cir. 2017); *Morrissey-Berru v. Our Lady of Guadalupe Sch.*, No. 17-56624, 2019 WL 1952853 (9th Cir. Apr. 30, 2019) (unpublished). And in each successive case, we have excised the ministerial exception, slicing through constitutional muscle and now cutting deep into core constitutional bone.

In turning a blind eye to St. James's religious liberties protected by both Religion Clauses, we exhibit the very hostility toward religion our Founders prohibited and the Supreme Court has repeatedly instructed us to avoid. Accordingly, I dissent.

I

The ministerial exception is well-entrenched in our constitutional framework. "The Supreme Court has long recognized religious organizations' broad right to control the selection of their own religious leaders." *Puri*, 844 F.3d at 1157. In 2012, a unanimous Supreme Court formally recognized a "ministerial exception" "grounded in the First Amendment[] that precludes application of [employment-

discrimination] legislation to claims concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor*, 565 U.S. at 188. In doing so, the Court reaffirmed "that it is impermissible for the government to contradict a church's determination of who can act as its ministers." *Id.* at 185.

## A

I begin with the text. "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. The Establishment Clause and Free Exercise Clause have been said to "often exert conflicting pressures," *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005), but they speak in harmony to ensure dual protections for religious freedom.

A troubled history of religious persecution led a young United States to break from the familiarities of living under the established Church of England. *See Hosanna-Tabor*, 565 U.S. at 182–83 ("Seeking to escape the control of the national church, the Puritans fled to New England, where they hoped to elect their own ministers and establish their own modes of worship." (citations omitted)). Creating a Federal Government with powers "few and defined," *see* The Federalist No. 45 (James Madison), the Founders confirmed that the new government, unlike the English Crown, would have no role in filling ecclesiastical offices. *See Hosanna-Tabor*, 565 U.S. at 184.

To avoid entangling government and religion, our government is prohibited from deciding matters inherently ecclesiastical. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 730–31 (1872). While the Establishment Clause expressly limits the government's power, the Free Exercise Clause also affirmatively protects religious institutions, which are

"independen[t] from secular control or manipulation," as they have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952). This includes the "[f]reedom to select the clergy." *Id.* By interfering with a religious institution's freedom to select those church personnel who promote its faith and mission, the government exceeds its delegated authority and infringes on that institution's right to free exercise of religion.

The Founders understood these First Amendment protections were so fundamental that enshrining them in the Constitution outweighed the ancillary costs. These costs, in some cases, are not insignificant. They include exemptions for religious organizations from some laws protecting society's most vulnerable from employment discrimination. *See* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* For example, after the Salvation Army terminated one of its ministers, the employee sued, alleging a violation of Title VII. *See McClure v. Salvation Army*, 460 F.2d 553 (5th Cir. 1972). The Fifth Circuit held the First Amendment barred the Title VII claim, reasoning that "[m]atters touching" "[t]he relationship between an organized church and its ministers . . . must necessarily be recognized as of prime ecclesiastical concern" because a church's "minister is the chief instrument by which [it] seeks to fulfill its purpose." *Id.* at 558–59. In the decades since, every Circuit to address the issue, including this one,[1] unanimously recognized this "ministerial exception."

---

[1] *See Werft v. Desert Sw. Annual Conference*, 377 F.3d 1099, 1101–04 (9th Cir. 2004).

B

In *Hosanna-Tabor*, the Supreme Court followed the uniform approach of the Courts of Appeals and held the ministerial exception bars employment discrimination suits by the group's ministers. 565 U.S. at 190. The case involved an employment discrimination claim brought by Cheryl Perich, a former elementary teacher, against her employer, Hosanna-Tabor Evangelical Lutheran Church and School. *Id*. at 177–79. Perich was first employed as a "lay teacher" and later became a "called teacher." *Id.* at 178. She taught kindergarten for four years and fourth grade for one year, which involved teaching a variety of subjects, including religion. *Id.* Specifically, Perich "taught a religion class four days a week, led the students in prayer and devotional exercises each day, and attended a weekly school-wide chapel service. [She] led the chapel service herself about twice a year." *Id.* After Perich was diagnosed with narcolepsy and terminated, the EEOC sued the school, and Perich intervened, alleging violations of the Americans with Disabilities Act ("ADA"), 104 Stat. 327, 42 U.S.C. § 12101 *et seq.* (1990). *Id.* at 180.

The Court held the ministerial exception "ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Id.* at 194–95 (internal citation omitted) (quoting *Kedroff*, 344 U.S. at 119). The Court explained:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its

beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

*Id.* at 188–89.

The Court unanimously held the ministerial exception barred Perich's suit. Although Perich was an elementary school teacher, the Court agreed with every Court of Appeals to have considered the question that the "exception is not limited to the head of a religious congregation." *Id.* at 190. However, the Court was "reluctant . . . to adopt a rigid formula for deciding when an employee qualifies as a minister." *Id.* Instead, it found that "all the circumstances of [Perich's] employment," supported "that the exception covers Perich." *Id.*

The Court discussed four "considerations" which supported its conclusion that Perich fell within the exception's scope: "the formal title given Perich by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church." *Id.* at 192. Each of these separate considerations evidenced Perich's ministerial role, including that her "job duties reflected a role in conveying the Church's message and carrying out its mission." *Id.* at 192. Thus, "the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out

their mission" warranted application of the exception to Perich. *Id.* at 196.

While each of the four considerations confirmed Perich was a minister, the Court's discussion of them did not create a test for courts to use to decide whether an employee was a "minister" under the exception.  The Court specifically reserved the ministerial exception's legal floor:  "We express no view on whether *someone with Perich's duties* would be covered by the ministerial exception *in the absence of the other considerations we have discussed.*"   *Id.* at 193 (emphasis added).

Justice Alito, joined by Justice Kagan, however, did express a view on this issue:  "[C]ourts should focus *on the function* performed by persons who work for religious bodies." *Id.* at 198 (Alito, J., concurring) (emphasis added).[2] This "functional consensus" was widespread before *Hosanna-Tabor* and has remained dominant afterward.[3]  As such, nothing in the opinion "should . . . be read to upset [the] consensus" among Courts of Appeals (including our own[4]) that took this "functional approach." *Id.* at 204.  The concurrence also cautioned it would be a mistake, given the country's religious diversity, "if the term 'minister' or the

---

[2] Justice Thomas went further, noting the Religion Clauses require courts "to defer to a religious organization's good-faith understanding of who qualifies as its minister." *Id.* at 196 (Thomas, J., concurring).

[3] *See Hollins v. Methodist Healthcare, Inc.*, 474 F.3d 223, 226 (6th Cir. 2007) (referring to function as the "general rule"), *abrogated in part by Hosanna-Tabor*, 565 U.S. at 195 n.4; *infra* Section IV.A.

[4] "The Ninth Circuit too has taken a functional approach, just recently reaffirming that 'the ministerial exception encompasses more than a church's ordained ministers.'" *Hosanna-Tabor*, 565 U.S. at 204 (Alito, J., concurring) (quoting *Alcazar*, 627 F.3d at 1291).

concept of ordination were viewed as central to the important issue of religious autonomy that is presented in cases like this one." *Id.* at 198.

## II

The panel majority mistakes *Hosanna-Tabor* to create a resemblance-to-Perich test using the "four considerations" which the Supreme Court found evidenced Perich's ministerial role. Because Biel's circumstances resembled Perich's in only one of the four areas, the panel majority held erroneously that the exception did not apply.

Biel taught fifth grade at St. James Catholic School in Torrance. *Biel*, 911 F.3d at 605. She was responsible for teaching her students all academic subjects and religion, to which she was required to dedicate a minimum of 200 minutes each week. *Biel v. St. James Sch.*, No. 15-04248, 2017 WL 5973293, at *1 (C.D. Cal. Jan. 24, 2017). She taught religion at least four days per week, using a curriculum and textbook grounded in the Catholic Faith and in accordance with the Church's teaching. *Biel*, 911 F.3d at 605. Biel also supervised and joined her students during twice-daily prayer led by students and escorted them to a school-wide monthly mass. *Id*.

Biel's signed employment contract required her to work toward St. James's "overriding commitment" to the "doctrines, laws, and norms" of the Catholic Church, and to "model, teach, and promote behavior in conformity to the teaching of the Roman Catholic Church." *Id*. It also stated the school's mission: "to develop and promote a Catholic School Faith Community within the philosophy of Catholic education as implemented at [St. James], and the doctrines, laws, and norms of the Catholic Church." *Id*. at 612 (Fisher, J., dissenting). The school's faculty handbook further

required that teachers "participate in the Church's mission" of providing "quality Catholic education to . . . students, educating them in academic areas and in . . . Catholic faith and values." *Id*. at 605–06 (majority op.).

At Biel's only formal teaching evaluation, the school's principal, Sister Mary Margaret, measured Biel's performance in both secular and religious aspects. *Id*. at 606. The evaluation was positive, though noting areas for improvement. *Id.* Less than six months later, Biel learned she had breast cancer. *Id.* She told the school she would miss work to undergo surgery and chemotherapy. *Id.*

A few weeks later, Biel was informed her teaching contract would not be renewed for the next academic year. *Id.* Biel sued St. James, alleging her termination violated the ADA. The district court determined the ministerial exception applied and granted summary judgment in favor of St. James. *Biel*, 2017 WL 5973293, at *3.

Our court reversed in a 2–1 decision. *Biel*, 911 F.3d 603. The panel majority compared Biel's circumstances with Perich's under each of the four "considerations," but concluded the only similarity between Biel and Perich was that "they both taught religion in the classroom." *Id.* at 609. Contrasting Biel and Perich, the majority determined Biel had "none of Perich's credentials, training, or ministerial background," St. James did not "hold Biel out as a minister by suggesting to its community that she has special expertise in Church doctrine, values, or pedagogy beyond that of any practicing Catholic," *id.* at 608, and "nothing in the record indicates that Biel considered herself a minister or presented herself as one to the community," *id*. at 609.

Because, "[a]t most, only one of the four *Hosanna-Tabor* considerations weigh[ed] in St. James's favor," the panel

majority held the ministerial exception did not apply. *Id*. at 610. The majority refused "to exempt from federal employment law all those who intermingle religious and secular duties but who do not 'preach [their employers'] beliefs, teach their faith, . . . carry out their mission . . . [and] guide [their religious organization] on its way.'" *Id*. at 611 (quoting *Hosanna-Tabor*, 565 U.S. at 196). The panel majority "decline[d] St. James's invitation to be the first" federal court of appeals to apply "the ministerial exception in a case that bears so little resemblance to *Hosanna-Tabor*." *Id.* at 610.

## III

When considering the "totality of the circumstances," the panel majority converted the four considerations discussed by the Supreme Court into a comparative test: "*Only after* describing all of these aspects of Perich's position did the Supreme Court hold . . . that Perich was a minister covered by the ministerial exception." *Id*. at 608 (emphasis added) (internal quotation marks omitted). Under the panel majority's test, a religious organization must show that its employee served a significant religious function *and* the presence of at least one additional "consideration" to receive protection under the ministerial exception.

But *Hosanna-Tabor* mandates no such requirement. It did not establish a test or set any legal floor that must be met for the exception to apply. It held only that the exception exists, applies to ADA claims, and covered Perich. *Hosanna-Tabor*, 565 U.S. at 190. The panel majority embraced the narrowest reading of the ministerial exception and diverged from the function-focused approach taken by our court previously, our sister courts, and numerous state supreme courts.

As our court recently observed, "The Supreme Court has provided *some guidance* on the circumstances that *might qualify an employee as a minister* within the meaning of the ministerial exception." *Puri*, 844 F.3d at 1160 (emphasis added). Other circuits agree. *See Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 658 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 456 (2018) ("Consequently, Grussgott's argument focuses on differentiating herself from the teacher in that case, and she is correct that her role is distinct from the called teacher's in *Hosanna-Tabor*. But the Supreme Court expressly declined to delineate a 'rigid formula' for deciding when an employee is a minister." (citing *Hosanna-Tabor*, 565 U.S. at 190)); *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 204–05 (2d Cir. 2017) ("*Hosanna-Tabor* instructs only as to what we *might* take into account as relevant, including the four considerations on which it relied; it neither limits the inquiry to those considerations nor requires their application in every case."); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 176–77 (5th Cir. 2012) ("Any attempt to calcify the particular considerations that motivated the Court in *Hosanna-Tabor* into a 'rigid formula' would not be appropriate . . . . Application of the exception . . . does not depend on a finding that [the employee] satisfies the same considerations that motivated the Court to find that Perich was a minister within the meaning of the exception.").

Ignoring the warnings of Justices Alito and Kagan (and Justice Thomas), the panel majority found that because three of the considerations—all of which relate to Biel's title—were not present, the exception did not apply. *See Biel*, 911 F.3d at 607–09. The only area in which it did find Biel and Perich similar was in the religious function each performed. Yet this similarity is particularly significant to religious groups whose beliefs and practices may render the

other three considerations less relevant, or not relevant at all. Such is the case here.

Comparing Biel's title to Perich's, the panel majority reasoned, "it cannot be said that [Biel's title of] Grade 5 Teacher 'conveys a religious—as opposed to secular—meaning.'" *Biel*, 911 F.3d at 608–09 (quoting *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834–35 (6th Cir. 2015)). Unlike in *Biel*, Perich's title in *Hosanna-Tabor* was particularly relevant because, as the Court noted, the Sixth Circuit "failed to see any relevance in the fact that Perich was a commissioned minister." *Hosanna-Tabor*, 565 U.S. at 192–93. Clarifying that her title "by itself, does not automatically ensure coverage," the Court explained that "the fact that an employee has been ordained or commissioned as a minister is surely relevant." *Id.* at 193. In this discussion, the Court did not suggest that the lack of a title with religious significance suggests that an employee does *not* hold a ministerial role. *See Fratello*, 863 F.3d at 207 ("Nor would plainly secular titles (by themselves) prevent application of the ministerial exception. We think the substance of the employees' responsibilities in their positions is far more important."). Indeed, requiring a religious group to adopt a formal title or hold out its ministers in a specific way is the very encroachment into religious autonomy the Free Exercise Clause prohibits, precisely because such a demand for ecclesiastical titles inherently violates the Establishment Clause.

Requiring religious titles is particularly problematic when religious organizations do not bestow such titles on some (or any) of their ministers yet clearly understand the employee's role to carry religious significance. This is why "a recognized religious mission [which] underlie[s] the description of the employee's position" is also "surely

relevant," just as an employee's title or ordination may be. *Hosanna-Tabor*, 565 U.S. at 193. Title may cut one way because "an employee is *more likely* to be a minister if a religious organization holds the employee out as a minister by bestowing a formal religious title." *Puri*, 844 F.3d at 1160 (emphasis added). Lack of a religious title does not suggest the opposite.

It's not surprising that Biel's title, as a Catholic school teacher, differed from Perich's title, as a Lutheran school teacher. "Minister," although commonly used in Protestant denominations, is "rarely if ever used in this way by *Catholics*, Jews, Muslims, Hindus, or Buddhists." *Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring) (emphasis added). Indeed, focus on Biel's title "trivialized how the distinct Catholic mission of integral formation permeated everything Ms. Biel did as a teacher" and "downplays Ms. Biel's function as a *Catholic* teacher." Brief for Nat'l Catholic Educ. Ass'n as Amicus Curiae in Support of Rehearing and Rehearing En Banc at 4.

Catholicism contains a rich history replete with evidence that its teachers play an essential role in its religious mission, yet it doesn't always embrace a formal title for such teachers as Hosanna-Tabor did with Perich. *See generally id.* at 5–9. Because of this, St. James thoroughly explained in its Motion for Summary Judgment why the role of the teacher comes with "duties and responsibilities" to be "performed within the School's overriding commitment to developing its faith" by incorporating "Catholic values and traditions throughout all subject areas, not just during the Religion course." St. James's Mot. For Summ. J. at 3–4, *Biel v. St. James Sch.*, No. 15-04248, ECF No. 65. Biel, as a teacher, played an "instrumental role in furthering and promoting the Catholic faith as part of her daily job duties." *Id.* at 13.

Nor is it surprising that a Catholic school's practices regarding ordination differ. As with title, religious training may be relevant, as it was in the Lutheran context. But other religious groups don't always require similar formal training yet clearly bestow ministerial roles. The concept of ordination—although recognized by some, and by some only as to certain offices—"has no clear counterpart" in others.[5] *Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring). The "Catholic Church has repeatedly emphasized that the growth of lay Catholic teachers—those who are succeeding roles previously held by religious orders, sisters, brothers, and clergy—does *not* change a Catholic teacher's responsibilities." Brief of Nat'l Catholic Educ. Ass'n as Amicus Curiae in Support of Rehearing and Rehearing En Banc at 14; *see also id.* at 8–9 & n.2 ("only 2.8% of Catholic full-time professional staff are either members of the clergy or religious orders"). These diverse religious practices are why Justices Alito and Kagan cautioned against emphasis on title.

Additionally, courts are ill-equipped to gauge the religious significance of titles or the sufficiency of training. Biel's title may appear to carry little or no religious significance to a court unfamiliar with the customs of Catholic education, but Biel's employment at St. James had significant religious substance. *See Biel*, 911 F.3d at 612–13, 616–18 (Fisher, J., dissenting) (documents, "including her employment contract, a performance review, and the faculty handbook," all supported applying the exception). Thus, when noting that Biel's title of "teacher" cannot be

---

[5] For example, Jehovah's Witnesses "consider all" adherents to be "ministers," while in Islam, "every Muslim can perform the religious rites, so there is no class or profession of ordained clergy." *Hosanna-Tabor*, 565 U.S. at 202 nn.3–4 (Alito, J., concurring) (citations omitted).

said to convey a religious meaning, the panel majority, just like the now-reversed Sixth Circuit in *Hosanna-Tabor*, overlooks the "recognized religious mission" which "underlie[s] the description of the employee's position." *Hosanna-Tabor*, 565 U.S. at 193.

Furthermore, ignoring this history and these practices risks the very Establishment Clause violation the ministerial exception was intended to prevent. As Justice Thomas explains:

> Our country's religious landscape includes organizations with different leadership structures and doctrines that influence their conceptions of ministerial status. The question whether an employee is a minister is itself religious in nature, and the answer will vary widely. Judicial attempts to fashion a civil definition of "minister" through a bright-line test or multi-factor analysis risk disadvantaging those religious groups whose beliefs, practices, and membership are outside of the "mainstream" or unpalatable to some.

*Id.* at 197 (Thomas, J., concurring).

Other courts have rightly considered these differences. For example, the Massachusetts Supreme Judicial Court applied the ministerial exception to a teacher at a Jewish school, although "she was not a rabbi, was not called a rabbi, and did not hold herself out as a rabbi" on a record "silent as to the extent of her religious training." *Temple Emanuel of Newton v. Mass. Comm'n Against Discrim.*, 975 N.E.2d 433, 443 (Mass. 2012).

Finally, the panel majority also contrasted how Perich held herself out as a minister, noting "nothing in the record indicates that Biel considered herself a minister or presented herself as one to the community." *Biel*, 911 F.3d at 609. That Perich *held herself* out as a minister merely evidenced her ministerial role; it did not institute a requirement that others must hold themselves out as ministers to qualify for the exception. That is one way in which an employee is "more likely to be considered a minister." *Puri*, 844 F.3d at 1160.

Biel's religious duties are far more relevant than whether she personally felt she was a minister. *See Grussgott*, 882 F.3d at 660 ("Grussgott's opinion does not dictate what activities the school may genuinely consider to be religious."). Presumably, any plaintiff who wishes to avoid the application of the exception will emphasize why she did not consider herself a minister.

In sum, as title, training, and how an employee holds herself out differ widely depending on tradition, courts have rightly focused on the fourth consideration—function.

IV

The panel majority rejected a function-focused approach embraced by all other circuits, including our own, before and after *Hosanna-Tabor*, in favor of its resemblance test. Despite Biel's religious function, the panel majority refused to apply the exception because it determined the other considerations were not present.[6] Biel's significant religious

---

[6] However, Judge Fisher in dissent persuasively found two of the "considerations" weighed in favor of the exception. *See Biel*, 911 F.3d at 616–20, 622 (concluding the ministerial exception applied because of

function, as a Catholic school teacher who teaches religion, demonstrates why the exception applies.

## A

The panel majority mistakes *Hosanna-Tabor* to hold that the ministerial exception cannot apply based on important religious functions alone, despite the Court's express reservation of the question. *See Biel*, 911 F.3d at 609 (rejecting that the exception applies based on function and "[i]f it did, most of the analysis . . . would be irrelevant dicta"); *id.* at 610 ("the other considerations that guided the reasoning in *Hosanna-Tabor* and its progeny are not present here").

Our court should have adhered to circuit precedent and followed the lead of our sister circuits by focusing on "the function performed by persons who work for religious bodies." *Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring). The majority's departure from the functional approach is even more surprising because the court has previously placed more emphasis on function post-*Hosanna-Tabor*.

> [A]n employee whose "job duties reflect a role in conveying the Church's message and carrying out its mission" is likely to be covered by the exception, even if the employee devotes only a small portion of the workday to strictly religious duties and

---

substance reflected in her title and important religious functions she performs).

> spends the balance of her time performing
> secular functions.

*Puri*, 844 F.3d at 1160 (internal brackets omitted) (quoting *Hosanna-Tabor*, 565 U.S. at 192). Teachers, like Biel, at mission-driven schools, like St. James, convey the Church's message and carry out its mission. In this court, this renders the employee "likely to be covered by the exception." *Id.* By allowing the panel majority's decision to stand, we have allowed a panel to contradict our precedent in a way that strips the exception of its core constitutional purpose.

After *Hosanna-Tabor*, other circuits have placed greater emphasis on an employee's function. *See Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 122 n.7 (3d Cir. 2018) ("[T]he ministerial exception applies to any claim, the resolution of which would limit a religious institution's right to choose who will perform particular spiritual functions.") (internal quotation marks omitted); *Grussgott*, 882 F.3d at 661 (finding teacher fell within exception, noting school intended plaintiff to take on a religious role including functions not part of a teacher's job at a secular school); *Fratello*, 863 F.3d at 205 ("Where, as here, the four considerations are relevant in a particular case, 'courts should focus' primarily 'on the function[s] performed by persons who work for religious bodies.'" (quoting *Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring))); *Cannata*, 700 F.3d at 177 (applying the exception because plaintiff performed important "function" that "furthered the mission of the church and helped convey its message").

Similarly, state supreme courts have emphasized the importance of function. *See Temple Emanuel of Newton*, 975 N.E.2d at 443 (holding function alone sufficed to apply

the exception); *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 613 (Ky. 2014) (courts should focus on the "actual acts or functions conducted by the employee").

B

The ministerial exception protects the "interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Hosanna-Tabor*, 565 U.S. at 196. It "insulates a religious organization's 'selection of those who will personify its beliefs.'" *Puri*, 844 F.3d at 1159 (quoting *Hosanna-Tabor*, 565 U.S. at 188). Justices Alito and Kagan found the ministerial exception "should apply to any 'employee' who leads a religious organization, conducts worship services or important religious ceremonies or rituals, *or serves as a messenger or teacher of its faith.*" *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring) (emphasis added). On many occasions, the Court has recognized the "critical and unique role of the teacher in fulfilling the mission of a church-operated school." *NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 501 (1979); *see also Lemon v. Kurtzman*, 403 U.S. 602, 617 (1971) ("Religious authority necessarily pervades [the Catholic] school system.").

Catholic school teachers certainly hold this special role. *See* Brief of Nat'l Catholic Educ. Ass'n as Amicus Curiae in Support of Rehearing and Rehearing En Banc at 5–9 (schools and teachers lay at the core of the church's ministry). According to the Vatican, the Catholic Church founded schools "because she considers them as a privileged means of promoting the formation of the whole man, since the school is a centre in which a specific concept of the world, of man, and of history is developed and conveyed." *Id*. at 5 (quoting The Sacred Congregation for Catholic Education, *The Catholic School* #8(5) (1977)). Teachers of

religion at religious schools, regardless of title, training, or official ordination, effectuate this purpose and carry out the Church's mission by ministering to students.[7]

At St. James, teachers "preach" and "teach" the school's Catholic beliefs and faith. By instructing new generations, teachers carry out the school's mission, precisely what a unanimous Supreme Court found relevant. *Hosanna-Tabor*, 565 U.S. at 192. Teachers personify the beliefs of the school and serve a crucial role in providing a holistic education to students. Biel's religious duties and function as a teacher at St. James show she was "entrusted with teaching and conveying the tenets of the [Catholic] faith to the next generation" and played a "substantial role in conveying the Church's message and carrying out its mission." *Id.* at 200, 204 (Alito, J., concurring) (internal quotation marks omitted). Employment decisions relating to those who serve this function is precisely what the ministerial exception is supposed to protect.

---

[7] The religious nature of teachers is not unique to Catholicism. *See* Brief for Church of God in Christ, Inc. and Union of Orthodox Jewish Congregations of Am. as Amicus Curiae in Support of Rehearing and Rehearing En Banc at 1, 14 (parochial K–12 schools teach "religious and secular studies in a holistic environment"; a central Jewish prayer repeats the Biblical directive to "[t]ake to heart these instructions with which [God] charges you this day" and to "[i]mpress them upon your children" (quoting *Worship Services: V'ahavta (Read)*, ReformJudaism.org, https://tinyurl.com/yddle9l6)); Brief for Gen. Conference of Seventh-day Adventists, Int'l Soc'y for Krishna Consciousness, Inc., Jewish Coal. for Religious Liberty, and Shaykh Hamza Yusuf as Amicus Curiae in Support of Rehearing and Rehearing En Banc at 2 ("[R]eligious education is a critical means of propagating the faith, instructing the rising generation, and instilling a sense of religious identity" for minority religious groups like *amici*.).

Our sister circuits pay closer attention to function, particularly in religious educational settings like the one here. *See, e.g.*, *Grussgott*, 882 F.3d at 657 (Jewish Day School teacher's role fell within "ministerial exception as a matter of law," given "[h]er integral role in teaching her students about Judaism and the school's motivation in hiring her, in particular, demonstrate that her role furthered the school's religious mission"); *Fratello*, 863 F.3d at 208–09 (former principal at Catholic school was a minister, emphasizing "function" was "the most important consideration"); *Conlon*, 777 F.3d at 837 (finding spiritual director at Christian college educational group a minister).

Indeed, religious groups will have differing "views on exactly what qualifies as an important religious position, but it is nonetheless possible to identify a general category of 'employees' whose functions are essential to the independence of practically all religious groups." *Hosanna-Tabor*, 565 U.S. at 200 (Alito, J., concurring). Among such groups are "those who are entrusted with teaching and conveying the tenets of the faith to the next generation." *Id.* Biel was certainly entrusted with this duty.

The panel majority's minimized view of the religious significance of Biel's role as a teacher stands in stark contrast to this court's view of the role of teachers in secular contexts. This court recently expounded on the instrumental role of a high school football coach—a role "akin to being a teacher"—as his "multi-faceted" job "entailed both teaching and serving as a role model and moral exemplar," because of which he had a "duty to use his words and expressions to 'instill[ ] values.'" *Kennedy v. Bremerton Sch. Dist.*, 869 F.3d 813, 825–27 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 634 (2019) (citations omitted). If true at a secular public school, how much more significant the role of an *elementary*

school teacher at a *Catholic school* who teaches *religion on a daily basis*?

Religion teaches morals and instills values, and "[t]he various characteristics of the [parochial] schools make them a powerful vehicle for transmitting the Catholic faith to the next generation." *Lemon*, 403 U.S. at 616 (internal quotation marks omitted).[8]   Teachers effectuate this purpose, and "[w]hen it comes to the expression and inculcation of religious doctrine, there can be no doubt that the messenger matters." *Hosanna-Tabor*, 565 U.S. at 201 (Alito, J., concurring).  This court's high view of the important role of teachers as role models for morality in a secular public school does not square with its view that teachers of religion at a religious school carry little religious significance.

## C

Our court is now the first to issue an opinion narrowing the First Amendment's ministerial exception to apply only where an employee of a religious organization serves a

---

[8] Whatever the continuing value of the legal test in *Lemon*, the Supreme Court's recognition of the religious mission of parochial schools remains unchallenged.  *See Am. Legion v. Am. Humanist Ass'n*, No.17-1717, slip op. at 12–16 (U.S. June 20, 2019) (plurality op. of Alito, J., joined by Roberts, C.J., Breyer, & Kavanaugh, JJ.) ("In many cases, this Court has either expressly declined to apply the test or has simply ignored it."); *id.*, slip op. at 1–4 (Kavanaugh, J., concurring) ("[T]he *Lemon* test is not good law and does not apply to Establishment Clause cases . . . ."); *id.*, slip op. at 6–7 (Thomas, J., concurring in the judgment) ("I would . . . overrule the *Lemon* test in all contexts."); *id.*, slip op. at 6–9 (Gorsuch, J., concurring in the judgment) ("*Lemon* was a misadventure."); *see also Freedom From Religion Found., Inc. v. Chino Valley Unified Sch. Dist. Bd. of Educ.*, 910 F.3d 1297, 1305–07 (9th Cir. 2018) (R. Nelson, J., joined by Bybee, Callahan, Bea, & Ikuta, JJ., dissenting from denial of rehearing en banc).

significant religious function *and* either bestows upon an employee a religiously significant title (at least in a court's view), or requires the employee to have obtained religious training.

The harmful effects of this opinion have already emerged. In *Morrissey-Berru*, another panel of this court applied *Biel*'s rule to hold summarily in an unpublished opinion that a Catholic school teacher's "significant religious responsibilities" were insufficient. No. 17-56624, 2019 WL 1952853, at *1. Like *Biel*, *Morrissey-Berru* reversed a district court judge's decision finding the exception applied. The panel acknowledged that Morrissey-Berru

> committed to incorporate Catholic values and teachings into her curriculum, as evidenced by several of the employment agreements she signed, led her students in daily prayer, was in charge of liturgy planning for a monthly Mass, and directed and produced a performance by her students during the School's Easter celebration every year.

*Id.* But because *Biel* held that "an employee's duties alone are not dispositive under *Hosanna-Tabor*'s framework," the panel concluded the exception did not bar Morrissey-Berru's claim. *Id.* The case for the ministerial exception in *Morrissey-Berru* is even stronger than in *Biel* given the Supreme Court's directive in *Hosanna-Tabor*. Absent further review of *Biel*, the implications are stark: Catholic schools in this circuit now have less control over employing its elementary school teachers of religion than in any other area of the country. Given our court's broad coverage, this is not insignificant. Now thousands of Catholic schools in

the West have less religious freedom than their Lutheran counterparts nationally.  *See Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

V

In applying the ministerial exception, our court should look to the function performed by employees of religious bodies.  Doing so would honor the foundational protections of the First Amendment and ensure *all* religious groups are afforded the same protection.