In the

# United States Court of Appeals

### For the Seventh Circuit

No. 17-2332

MIRIAM GRUSSGOTT,

*Plaintiff-Appellant,*

*v.*

MILWAUKEE JEWISH DAY SCHOOL, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 16-CV-1245 — **J.P. Stadtmueller**, *Judge.*

SUBMITTED JANUARY 24, 2018 — DECIDED FEBRUARY 13, 2018

Before BAUER, KANNE, and BARRETT, *Circuit Judges.*

PER CURIAM. Miriam Grussgott, a Hebrew teacher, sued her former employer, Milwaukee Jewish Day School, for firing her in violation of the Americans with Disabilities Act. The school moved for summary judgment, arguing that the First Amendment's ministerial exception to employment-discrimination laws, including the ADA, barred Grussgott's suit. The district court granted the motion, concluding that the

school is a religious institution and that Grussgott's role there was ministerial. We affirm.

## I. BACKGROUND

Our account of the facts here tracks the summary-judgment standard, setting forth the facts that cannot reasonably be disputed based on the record evidence, but also giving Grussgott, as the non-moving party, the benefit of conflicts in the evidence and drawing reasonable inferences in her favor. *See Carson v. ALL Erection & Crane Rental Corp.*, 811 F.3d 993, 994 (7th Cir. 2016).

Milwaukee Jewish Day School is a private school dedicated to providing a non-Orthodox Jewish education to Milwaukee schoolchildren. Students are taught Jewish studies and Hebrew and engage in daily prayer. The school also employs a rabbi on staff and has its own chapel and Torah scrolls. But the school does not require its teachers to be Jewish and has an antidiscrimination policy expressly barring discrimination on the basis of religion, as well as race, gender, and sexual orientation.

The school hired Grussgott in 2013 to teach both Hebrew and Jewish studies to first- and second-graders. Grussgott had an extensive background teaching both of these subjects, which was relevant to the school's decision to hire her. She was then rehired for the 2014-15 school year as a second- and third-grade teacher, but the parties' opinions regarding her duties at this time differ. Grussgott states that she was rehired solely as a Hebrew teacher and that she had no job responsibilities that were religious in nature. She says that during the 2014–15 school year, she was no longer invited to attend the Jewish Studies meetings that she had been required to attend

the previous year. She does acknowledge, however, that she taught Hebrew from an integrated Hebrew and Jewish Studies curriculum, known as Tal Am, and that she attended community prayer sessions. She also concedes that she discussed Jewish values with her students, taught about prayers and Torah portions, and discussed Jewish holidays and symbolism. But, she asserts, this teaching was done from a cultural and historical, rather than a religious, perspective. She also attests that these portions of her lessons were taught voluntarily, not as part of her formal job requirements.

The school maintains that Grussgott continued to be employed as a Hebrew and Jewish Studies teacher during the 2014–15 school year and that she should have continued to attend the Jewish Studies meetings at this time. The school also disputes that Grussgott's teaching of prayer and the Torah was voluntary, maintaining that this was in fact part of the school's curriculum and mission generally.

Grussgott underwent medical treatment for a brain tumor in 2013 and ceased working during her recovery. She has since suffered memory and other cognitive issues. She returned to work in June 2014. During a March 2015 telephone call from a parent, Grussgott was unable to remember an event, and the parent taunted her about her memory problems. Grussgott's husband (a rabbi) then sent an email, from Grussgott's work email address, criticizing the parent for being disrespectful. The school terminated Grussgott after the incident. Grussgott then sued the school under the Americans with Disabilities Act, claiming that she was terminated because of her cognitive issues resulting from her brain tumor.

The school moved for summary judgment, arguing that because of Grussgott's religious role at the school, the ministerial exception barred her lawsuit. Grussgott's evidence in opposition included the declaration of Michael Broyde, an ordained rabbi and law professor at Emory University. Broyde stated that his knowledge regarding the ministerial exception led him to believe that it did not apply to Grussgott's duties. The district court disregarded this testimony, noting that the "application of precedent to a given factual scenario is a question of law, and the Court is the only expert permitted to address such questions." The district court determined that the ministerial exception applied to Grussgott, and consequently did not consider the merits of her ADA claim. Grussgott appealed and is now proceeding pro se.

## II. ANALYSIS

The primary issue before us is whether Grussgott was a ministerial employee. In 2012, the Supreme Court adopted the "ministerial exception" to employment discrimination laws that the lower federal courts had been applying for years. *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C*, 565 U.S. 171, 188 (2012). Under both the Free Exercise Clause, "which protects a religious group's right to shape its own faith and mission through its appointments," and the Establishment Clause, "which prohibits government involvement in such ecclesiastical decisions," religious organizations are free to hire and fire their ministerial leaders without governmental interference. *Id*. at 188–89. The Court declined, however, to delineate a clear test for determining who is a ministerial employee. *Id.* at 190.

Consequently, whether Grussgott's role as a Hebrew teacher can properly be considered ministerial is subject to a

fact-intensive analysis. And usually such questions are left for a jury. Ultimately, however, even taking Grussgott's version of the facts as true, she falls under the ministerial exception as a matter of law. Her integral role in teaching her students about Judaism and the school's motivation in hiring her, in particular, demonstrate that her role furthered the school's religious mission.

As a preliminary matter, we must confirm that the school is a religious institution entitled to assert protection under the ministerial exception. Religious schools can be religious institutions capable of claiming the ministerial exception. *See Hosanna-Tabor*, 565 U.S. at 188–89. Grussgott argues that the school is not a religious institution because it does not adhere to Orthodox principles, employs a rabbi only in an advisory (rather than supervisory) capacity, and has a nondiscrimination policy. But the school's decision to cater toward Conservative, Reform, and Reconstructionist Jewish families, as opposed to Orthodox ones, does not deprive it of its religious character. *See Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 310 (4th Cir. 2004) (explaining that key inquiry is whether organization's "mission is marked by clear or obvious religious characteristics"). Nor is there any requirement, as Grussgott seems to think, that a religious institution employ "ordained clergy" at the head of an "ecclesiastical hierarchy." Such a constraint would impermissibly favor religions that have formal ordination processes over those that do not. *See Hosanna-Tabor*, 565 U.S. at 198 (Alito, J., concurring); *see also Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

Further, the school's nondiscrimination policy does not constitute a waiver of the ministerial exception's protections. There is no requirement that an organization exclude members of other faiths in order to be deemed religious. *See Hosanna-Tabor*, 565 U.S. at 177 (finding school was religious organization even though lay teachers were not required to be Lutheran). And, in any event, a religious institution does not waive the ministerial exception by representing itself to be an equal-opportunity employer. *See Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1041–42 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171 (2012)). We therefore should not use the school's promotion of inclusion as a weapon to challenge the sincerity of its religious beliefs.

The closer question is whether Grussgott's role can properly be considered ministerial. This case presents the first opportunity for us to address the ministerial exception in light of *Hosanna-Tabor*. Consequently, Grussgott's argument focuses on differentiating herself from the teacher in that case, and she is correct that her role is distinct from the called teacher's in *Hosanna-Tabor*. But the Supreme Court expressly declined to delineate a "rigid formula" for deciding when an employee is a minister. *Hosanna-Tabor*, 565 U.S. at 190, 192. Instead, the Court emphasized that it was conducting a fact-intensive analysis, considering (1) "the formal title" given by the Church, (2) "the substance reflected in that title," (3) "[the teacher's] own use of that title," and (4) "the important religious functions she performed for the Church." *Id*. at 192.

As noted by The Becket Fund for Religious Liberty in its amicus brief, other courts of appeals have explained that the same four considerations need not be present in every case

involving the exception. *See Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 206 (2d Cir. 2017) (concluding that lay principal was covered by ministerial exception after discussing considerations in *Hosanna-Tabor*); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 835 (6th Cir. 2015) (finding that the ministerial exception applied when only two of four *Hosanna-Tabor* factors were present); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 176 (5th Cir. 2012) ("Any attempt to calcify the particular considerations that motivated the Court in *Hosanna-Tabor* into a 'rigid formula' would not be appropriate"). But because they provide a useful framework, we examine those factors here.

First, Grussgott's job title cuts against applying the ministerial exception. She identifies her role as "grade school teacher." This ostensibly lay title is distinct from *Hosanna-Tabor*, in which the plaintiff was a "called teacher" (as opposed to a "lay teacher") who had been given the formal title of "Minister of Religion, Commissioned." *Hosanna-Tabor*, 565 U.S. at 178, 191. And even if we consider her title to be "Hebrew teacher," this alone would not show that Grussgott served a religious role. One might have this same title at a public school and perform a completely secular job, although, in this case, the school insists that its students learn Hebrew as a religious exercise that cannot be characterized simply as foreign-language instruction. In any case, Grussgott's title alone, while "surely relevant," is not "by itself" dispositive. *Id*. at 193. Assuming that Grussgott had the purely secular title of "grade school teacher" does not rule out the application of the ministerial exception. *See Tomic*, 442 F.3d at 1040–41 (applying exception to organist/music director); *Alicea-Hernandez v. Catholic Bishop of Chi.*, 320 F.3d 698, 704 (7th Cir. 2003) (applying exception to press secretary).

Grussgott's use of her title also does not support the appli-
cation of the ministerial exception. In analyzing this factor,
other circuits have examined how an employee presented
herself to the public. *See Conlon*, 777 F.3d at 835 (concluding
that teacher who occasionally led prayer did not satisfy this
consideration because she did not have public role interacting
with community); *Fratello*, 863 F.3d at 208 (explaining that
school principal presented herself as spiritual leader by lead-
ing school prayer and conveying religious messages in
speeches and newsletters). There is no evidence that
Grussgott ever held herself out to the community as an am-
bassador of the Jewish faith, nor that she understood that her
role would be perceived as a religious leader. *See Conlon*, 777
F.3d at 835; *Fratello*, 863 F.3d at 208. Rather, she has consist-
ently maintained that her teaching was historical, cultural,
and secular, rather than religious. Although, as discussed be-
low, we cannot consider the accuracy of this distinction
(which the school insists does not exist), how Grussgott de-
fined her position at the school and to the community is rele-
vant.

The substance reflected in Grussgott's job title, on the
other hand, weighs in favor of applying the ministerial excep-
tion. True, teachers at the school were not required to com-
plete rigorous religious requirements comparable to the
teacher in *Hosanna-Tabor. See* 565 U.S. at 191 (noting that it
took plaintiff six years to complete educational coursework
and other requirements to become commissioned minister).
And though Grussgott obtained the certification required for
Tal Am, the record lacks any description of what this entailed
other than the completion of seminars in either the United
States or Israel. *See Conlon*, 777 F.3d at 835 (finding this factor
was not demonstrated when employee received certification

in "spiritual direction" but court was not provided with further details). But Hebrew teachers at Milwaukee Jewish Day School were expected to follow the unified Tal Am curriculum, meaning that the school expected its Hebrew teachers to integrate religious teachings into their lessons. Grussgott's resume also touts significant religious teaching experience, which the former principal said was a critical factor in the school hiring her in 2013. Thus, the substance of Grussgott's title as conveyed to her and as perceived by others entails the teaching of the Jewish religion to students, which supports the application of the ministerial exception here. *See Fratello*, 863 F.3d at 208.

The final factor also supports the application of the ministerial exception. Specifically, Grussgott performed "important religious functions" for the school. *Hosanna-Tabor*, 565 U.S. at 192; *see Alicia-Hernandez*, 320 F.3d at 703. Grussgott undisputedly taught her students about Jewish holidays, prayer, and the weekly Torah readings; moreover, she practiced the religion alongside her students by praying with them and performing certain rituals, for example. Grussgott draws a distinction between leading prayer, as opposed to "teaching" and "practicing" prayer with her students. She also challenges the notion that the "Jewish concept of life" taught at Milwaukee Jewish Day School is religious, claiming this too is predominately taught in a historical manner. But Grussgott's opinion does not dictate what activities the school may genuinely consider to be religious. "What makes the application of a religious-secular distinction difficult is that the character of an activity is not self-evident." *See Corp. of Presiding Bishop of Church of Jesus Latter-day Saints v. Amos*, 483 U.S. 327, 343 (1987) (Brennan, J., concurring in judgment). For example, some might believe that learning the history behind

Jewish holidays is an important *part* of the religion. Grussgott's belief that she approached her teaching from a "cultural" rather than a religious perspective does not cancel out the specifically religious duties she fulfilled.

Further, there may be contexts in which drawing a distinction between secular and religious teaching is necessary, but it is inappropriate when doing so involves the government challenging a religious institution's honest assertion that a particular practice is a tenet of its faith. *See Sch. of Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 306 (1963) (Goldberg, J., concurring) (recognizing distinction between "teaching religion" and "teaching about religion" in determining what is permissible to teach in public schools). And not only is this type of religious line-drawing incredibly difficult, it impermissibly entangles the government with religion. *See Amos*, 483 U.S. at 343 ("[D]etermining whether an activity is religious or secular requires a searching case-by-case analysis. This results in considerable ongoing government entanglement in religious affairs."); *Alicea-Hernandez*, 320 F.3d at 702. This does not mean that we can never question a religious organization's designation of what constitutes religious activity, but we defer to the organization in situations like this one, where there is no sign of subterfuge. *See Tomic*, 442 F.3d at 1039.

Grussgott maintains that because she voluntarily performed religious functions but was not *required* to do so, she remained a secular employee. She concedes that she taught her students about prayer, Torah portions, and Jewish holidays, but says that it does not matter because she chose these topics. But whether Grussgott had discretion in planning her

lessons is irrelevant; it is sufficient that the school clearly intended for her role to be connected to the school's Jewish mission. In *Hosanna-Tabor*, the Court considered it important that the plaintiff was "expressly charged" with "lead[ing] others to Christian maturity." *Hosanna-Tabor*, 565 U.S. at 192. Comparably, Milwaukee Jewish Day School expected Grussgott to follow its expressly religious mission and to teach the Tal Am curriculum, which is designed to "develop Jewish knowledge and identity in [its] learners." *Mission*, HEBREW AND HERITAGE CURRICULA FOR JEWISH SCHOOLS, http://www.talam.org/mission.html (last visited Jan. 10, 2017); *see Conlon*, 777 F.3d at 835. This, combined with the importance of Grussgott's Judaic teaching experience in her being hired, confirms that the school expected her to play an important role in "transmitting the [Jewish] faith to the next generation." *Hosanna-Tabor*, 565 U.S. at 192. Even if Grussgott did not know this, the purpose of the ministerial exception is to allow religious employers the freedom to hire and fire those with the ability to shape the practice of their faith. Thus, it is the school's expectation—that Grussgott would convey religious teachings to her students— that matters. *See Cannata*, 700 F.3d at 177 (explaining that music director served ministerial role because he conveyed church's message to congregants, even though he believed he "merely played the piano at Mass" and completed secular duties).

Furthermore, although Grussgott maintains that any religious tasks she performed were voluntary, there is evidence that she was tasked with specific religious duties on occasion. At least once in 2015, the school rabbi asked her to take the second-graders to study the week's Torah portion. And even Grussgott's own (rejected) expert contradicts her assertion

that any religious role she took on was voluntary: his declaration states that Grussgott is "called upon to 'lead in prayer' … in the course of a teaching component of her job."

In this case, at most two of the four *Hosanna-Tabor* factors are present. But even referring to them as "factors" denotes the kind of formulaic inquiry that the Supreme Court has rejected. And surely it would be overly formalistic to call this case a draw simply because two "factors" point each way. As the district court concluded, the "formalistic factors are greatly outweighed by the duties and functions of [Grussgott's] position." The school intended Grussgott to take on a religious role, and in fact her job entailed many functions that simply would not be part of a secular teacher's job at a secular institution.

Eschewing a formal four-factor test, however, does not warrant adopting the approach of the amicus, which, though narrower, is just as formulaic. The amicus argues that we should adopt a purely functional approach to determining whether an employee's role is ministerial. In other words, it suffices to ascertain whether an employee performed religious functions and apply the exception if she did. But looking *only* to the function of Grussgott's position would be inappropriate. *See Cannata*, 700 F.3d at 176 ("[B]ecause the Supreme Court eschewed a 'rigid formula' in favor of an all-things-considered approach, courts may not emphasize any one factor at the expense of other factors."); *Conlon*, 777 F.3d at 835 (declining to decide whether the presence of the fourth factor is sufficient to find the ministerial exception applies). We read the Supreme Court's decision to impose, in essence, a totality-of-the-circumstances test. And it is fair to say that, under the totality of the circumstances in this particular case,

the importance of Grussgott's role as a "teacher of [] faith" to the next generation outweighed other considerations. *See Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring). We do not adopt amici's position that "function" is the determining factor as a general rule; instead, all facts must be taken into account and weighed on a case-by-case basis.

As a final matter, Grussgott argues that the district court abused its discretion when it disregarded Broyde's expert testimony. But the court acted reasonably by not considering Broyde's declaration. The declaration conveyed a legal opinion as to whether the ministerial exception applied to Grussgott. As the district court properly recognized, Broyde had overstepped his role as an "expert" by opining on the ultimate question of whether Grussgott was a ministerial employee. *United States v. Knoll*, 785 F.3d 1151, 1156 (7th Cir. 2015); FED. R. EVID. 702(a). Courts do not consult legal experts; they are legal experts.

## III. CONCLUSION

Some factual disputes exist in this case, but they are not enough to preclude summary judgment. Even if we disregarded the school's version of facts altogether, Grussgott's own admissions about her job are enough to establish the ministerial exception as a matter of law. For these reasons, we AFFIRM the district court's grant of summary judgment in favor of the defendant-appellee.