In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2844

STANISLAW STERLINSKI,

*Plaintiff-Appellant,*

*v.*

CATHOLIC BISHOP OF CHICAGO,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 00596 — **Edmond E. Chang**, *Judge.*

ARGUED APRIL 1, 2019 — DECIDED AUGUST 8, 2019

Before EASTERBROOK, SYKES, and BRENNAN, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Saint Stanislaus Bishop & Martyr Parish in Chicago hired Stanislaw Sterlinski in 1992 as Director of Music. In 2014 the Parish's priest (Anthony Dziorek, C.R.) demoted Sterlinski to the job of organist and in 2015 fired him outright. He contends in this employment-discrimination suit against the Bishop of Chicago that the Parish held his Polish heritage against him. Until his demotion he could have been fired for any reason, because as Di-

rector of Music he held substantial authority over the conduct of religious services and would have been treated as a "minister" for the purpose of *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012), which holds that Title VII of the Civil Rights Act of 1964 does not apply to ministers. But as organist, Sterlinski says, he was just "robotically playing the music that he was given" and could not be treated as a minister. The district court disagreed with this proposed distinction between music-related positions and granted summary judgment to the Bishop. 319 F. Supp. 3d 940 (N.D. Ill. 2018).

As Director of Music Sterlinski selected the music to be played at services; as organist he did not. As Director of Music he had participated in budgeting, taught the church's choirs, and served on the Archdiocese's music committee. The parties disagree about whether, in his reduced role as organist, he was a "minister" for the purpose of *Hosanna-Tabor*. The Bishop's argument, which the district judge accepted, is that music is vitally important to the services of the Roman Catholic Church. Music traditionally has not played a role in services of the Society of Friends, and its role in other faiths varies, but in Roman Catholic services music is integral to the mass and many other activities. The district judge observed that the United States Conference of Catholic Bishops issued *Sing to the Lord: Music in Divine Worship*, an 87-page document (with 235 footnotes!) explaining how music advances not only celebration of the mass but also other devotional matters. *Sing to the Lord* addresses at length the importance of organ playing. This persuaded the district judge that an organist is, if not as important to services as a priest or cantor, a part of religious exercise, so that an organist is properly called a "minister" under *Hosanna-Tabor*.

Sterlinski stresses that he has not been ordained, unlike Cheryl Perich, whose firing led to *Hosanna-Tabor*. And he describes an organist as a "ministerial" position in a way different from what the Justices in *Hosanna-Tabor* described as the "ministerial exception" to Title VII: he just played the notes on the sheet music that Father Dziorek told him to use. (This suggests that the "ministerial exception" might be renamed the "ministry exception" or "the rule of *Hosanna-Tabor*" to avoid confusion with the sense of "ministerial" as mechanical or straightforward.) Sterlinski wants us to decide for ourselves whether an organist's role is sufficiently like that of a priest to be called part of the ministry. That's the path followed by a divided panel in *Biel v. St. James School*, 911 F.3d 603 (9th Cir. 2018), rehearing en banc denied (over the dissent of nine judges), 926 F.3d 1238 (2019). *Biel* did not involve an organist. We cite it, rather, because it holds that a court will decide for itself whether a given employee served a religious as opposed to a secular function.

Our circuit, however, adopted a different approach in *Grussgott v. Milwaukee Jewish Day School, Inc.*, 882 F.3d 655 (7th Cir. 2018). We examined a variety of factors not to determine what judges think as an original matter, but to determine whether the employee (Grussgott taught Hebrew in a Jewish school using the Tal Am curriculum) was serving a religious function. The Ninth Circuit in *Biel* wrote:

> Even assuming *Grussgott* was correctly decided, which we are not sure it was, the plaintiff in *Grussgott* more closely resembled Perich than Biel does. Although the plaintiff in *Grussgott* lacked a formal religious title, she had obtained a certification in a Jewish curricular program called Tal Am—a curriculum that involved integrating religious teachings into Hebrew lessons[.]

911 F.3d at 609. The panel then went on to make an independent assessment, essentially disregarding what Biel's employer (a Roman Catholic school) thought about its own organization and operations. The judges who dissented from the denial of rehearing in *Biel* disagreed with that approach—which asks how much like Perich a given plaintiff is, rather than whether the employee served a religious function—as do we.

*Hosanna-Tabor* interpreted federal employment-discrimination laws in light of two goals reflected in the Religion Clauses of the First Amendment. The Free Exercise Clause protects a religious body's "right to shape its own faith and mission through its appointments", and the Establishment Clause "prohibits government involvement in such ecclesiastical decisions". 565 U.S. at 188–89. See also *Watson v. Jones*, 80 U.S. 679, 728–29 (1872); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952); *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976). If the Roman Catholic Church believes that organ music is vital to its religious services, and that to advance its faith it needs the ability to select organists, who are we judges to disagree? Only by subjecting religious doctrine to discovery and, if necessary, jury trial, could the judiciary reject a church's characterization of its own theology and internal organization. Yet it is precisely to avoid such judicial entanglement in, and second-guessing of, religious matters that the Justices established the rule of *Hosanna-Tabor*. Many judges, not just our panel in *Grussgott* (and the nine dissenters in *Biel*), have declined to make independent decisions on religious disputes in order to resolve *Hosanna-Tabor* issues. See, e.g., *Fratello v. Archdiocese of New York*, 863 F.3d 190, 204–06 (2d Cir. 2017);

*Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 176–77 (5th Cir. 2012).

It is easy to see a potential problem with a completely hands-off approach. Suppose a church insists that *everyone* on its payroll, down to custodians and school-bus drivers, is a minister. That is not fanciful—it is what one religious group *did* assert in *Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290 (1985), in claiming an immunity from federal minimum-wage legislation. The Justices rejected that claim in *Alamo Foundation* and we assume that they would be equally unreceptive in litigation under Title VII. But then where does one draw the line between judicial abnegation (which *Alamo Foundation* rejected) and independent judicial resolution of ecclesiastical issues (which *Biel* embraced)?

The answer lies in separating pretextual justifications from honest ones. In normal Title VII litigation a court does not start with the question whether the discharge or other adverse action was caused by prejudice. It waits for the employer to articulate a reason for the discharge and then asks whether that reason is pretextual—in other words, whether it is honest. If the court finds that the reason is honest, it does not ask whether the reason is *correct*—it is enough that the employer believe its own reason in good faith. And the burden of showing pretext rests with the plaintiff. See *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993) (describing how this burden-shifting process works); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) (same). A church claiming "minister" status for bus drivers would invite a finding of pretext, but a church claiming that persons who

chant, sing, or play music during a service perform religious functions is on solid ground.

Pretext, and for that matter the rule of *Hosanna-Tabor*, is not something a plaintiff's complaint need address. The ministerial exception is a defense, not a component of subject-matter jurisdiction, see *Hosanna-Tabor*, 565 U.S. at 195 n.4, and complaints need not anticipate defenses. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Pretext analysis is part of the burden-shifting sequence discussed in *St. Mary's Honor Center* and *Reeves*. Once the defendant raises a justification for an adverse employment action, the plaintiff can attempt to show that it is pretextual. The defense bears the burden of articulating the justification, but the plaintiff bears the burden of showing that the justification is a pretext.

Sterlinski does not contend that the Bishop's justification for calling him a "minister" is pretextual. *Sing to the Lord* was issued in 2007, well before Sterlinski's discharge, and reflects a longstanding tradition; it is not an explanation hoked up for the occasion. Sterlinski does contend that his playing was "robotic" and therefore cannot have entailed the exercise of religiously salient discretion (as the selection of music might have done), but a church may decide that any organist who plays like a robot *ought* to be fired. Performers must put their hearts into playing, or they won't be effective. A priest who delivered the homily in a monotone would not advance the church's religious mission; no more does an organist who proclaims that he plays mechanically.

Even Hieronymus von Colloredo, the Prince-Archbishop of Salzburg who sacked Wolfgang Mozart, understood that music has a vital role in the Roman Catholic faith. After Colloredo decided that the mass, including its music, must not

exceed 45 minutes, Mozart asked for leave to travel. Colloredo refused and fired him, with the insult "Soll er doch gehen, ich brauche ihn nicht!" ("He should just go then; I don't need him!"). Colloredo thought that lesser (and less demanding) musicians would suffice; he did not remove music from the mass. In 1782 he abolished instrumental music in church and severely limited accompanied music, but the organ remained. The rest of the world gained from Colloredo's decisions, as Mozart moved to Vienna and went on to produce secular masterpieces such as the *Marriage of Figaro* and the *Jupiter Symphony*, as well as two glorious masses in which the music alone exceeds 45 minutes (the Mass in C minor, K. 427/417a, and the Requiem, K. 626).

The record shows that organ playing serves a religious function in the life of Saint Stanislaus Bishop & Martyr Parish. Under the rationale of *Hosanna-Tabor*, Sterlinski's discharge is therefore outside the scope of Title VII.

AFFIRMED