In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2524

LYNN STARKEY,

*Plaintiff-Appellant,*

*v.*

ROMAN CATHOLIC ARCHDIOCESE OF INDIANAPOLIS, INC. and
RONCALLI HIGH SCHOOL, INC.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:19-cv-03153 — **Richard L. Young**, *Judge.*

ARGUED MAY 16, 2022 — DECIDED JULY 28, 2022

Before EASTERBROOK, BRENNAN, and ST. EVE, *Circuit Judges.*

BRENNAN, *Circuit Judge.* The ministerial exception, grounded in the First Amendment's Religion Clauses, bars interference with the selection and control of a religious organization's ministers. The issues here are whether a guidance counselor at a Catholic high school is a minister, and whether the ministerial exception applies to state law claims made by the guidance counselor.

**I**

Roncalli High School ("Roncalli") is a Catholic school in the Archdiocese of Indianapolis. Its mission is to "provide, in concert with parents, parish, and community, an educational opportunity which seeks to form Christian leaders in body, mind, and spirit." Roncalli supports and "further[s] the mission and purposes of" the Archdiocese. As the Archdiocese and Roncalli explain, their relationship is governed by Catholic theology and canon law.[1]

Charles Weisenbach, Roncalli's principal, is responsible for hiring "faculty and staff whose values are compatible" with the school's mission. When hiring, Weisenbach considers whether a candidate is a "faithful Catholic," "involved in the Catholic community," and "wants to grow with" the school. If possible, the school prefers to hire Catholics for teaching, administrative, and guidance counseling positions. Ideally, "all teachers and guidance counselors that are hired would be qualified, faithful Catholics." After a candidate is hired, Roncalli continues to evaluate "which teachers and counselors are actively seeking opportunities to be involved in the faith formation and overall development of [its] students." This involvement is considered when deciding which employees to retain or promote.

Lynn Starkey began working at Roncalli in 1978 as an assistant band director and choral director. Her job included teaching choral music, selecting music for that curriculum (some of which was religious), and preparing "students for the music that was used during the all-school liturg[ies]."

---

[1] "A body of law developed within a particular religious tradition." *Canon Law*, BLACK'S LAW DICTIONARY (11th ed. 2019).

After three years, Starkey left Roncalli to complete a one-year master's degree in music education. When she returned, she transitioned into a new role as Roncalli's New Testament teacher and became a certified catechist. About seven years later, Starkey also became the school's fine arts chair. In that job she oversaw the school's "band, choir, the visual arts, and theater," as well as evaluated the teachers in the department. Although she did not consider this new position to be a promotion, it came with a pay raise and additional responsibilities. After about nine years, Starkey became a guidance counselor, a position for which she completed a master's degree in school counseling.

Some guidance counselors at Roncalli discuss and practice their faith with students. For example, one guidance counselor testified that praying and attending liturgies with students was a regular part of her job. Another former counselor disagreed and testified that she did not recall praying with students. Starkey submits that although some counselors might act in this capacity, she never discussed religion during a student consultation. Instead, when confronted with non-academic concerns, she would refer a student to a social worker or chaplain. Starkey acknowledges that at the principal's request, more than once she delivered a morning prayer over the school's public address system.

A decade later, Starkey became Roncalli's Co-Director of Guidance. This position involved supervision of the school's guidance counselors and oversight of the department's social work. Her responsibilities included tasks related to the budget, course catalog, course description book, and curriculum updates from the Indiana Department of Education. According to Starkey, her "job was to provide academic, college,

and career guidance to students and to provide resources and referrals as needed." As a supervisor, she also discussed religious topics with staff and administration. For example, Starkey instructed staff how to prepare students of different faiths for the Catholic liturgy. And in May 2016, she wrote Weisenbach that if "school counselors had a Ministry Description, it would be identical to that of teachers," with only two exceptions unrelated to religion.

Starkey does not dispute that as Co-Director of Guidance she helped draft performance criteria for Roncalli to evaluate the guidance counselors under her supervision. Among the criteria for a "Distinguished School Counselor" half were religious factors, such as:

- "School counselor embodies the charisms of Saint John XXIII [Angelo Roncalli] and lives out his traits."

- "School counselor encourages students' spiritual life and resources in counseling conversation as appropriate (i.e. encouraging prayer/reflection, sharing one's own spiritual experiences as appropriate; encouraging retreat, parish, youth ministry, mission work)."

- "School counselor consistently attends their Sunday liturgy or church service."

Starkey is not a practicing Catholic. She did not receive religious training or claim religious tax deductions while at Roncalli. The school did not ask whether she donated financially to the Catholic Church or regularly attended Mass. Starkey does not dispute that she attended monthly school

Masses, during which she received Communion and sang with the congregation. Several times she went to "Days of Reflection," an annual event meant to focus faculty "who are impacting kids in their spiritual life on a day-to-day basis" on the Catholic mission. These events involved a call-and-response Commissioning Prayer, in which faculty accepted the responsibilities of their ministry. Starkey and several others do not recall participating in the call-and-response prayer.

As part of her job, Starkey served on Roncalli's main leadership body, the Administrative Council. According to Weisenbach, "[m]ost faculty and staff recognize the Administrative Council as the lifeblood of decision-making at the school." The Council meets weekly to address Roncalli's "day-to-day operations and spiritual life." Together, "the Administrative Council and the Department Chairs are responsible for 95% of Roncalli's daily ministry, education, and operations." Along with these day-to-day operations, the Administrative Council makes decisions related to the school's religious mission, such as arranging logistics for an all-school liturgy and qualifications for a student to serve as a eucharistic minister.[2]

Starkey maintains that although she may have been in a position to provide input on religious matters, she never actually did so. As a member of the Administrative Council, she contributed little to nothing on topics related to religion, and only voiced her opinion on non-religious matters that came

---

[2] According to Catholic canon law, "an acolyte or another member of the Christian faithful designated" to distribute Communion. 1983 CODE c.910, § 2.

before it. The Faculty Handbook did not list her as a leader of the "Faith Community," so she largely deferred to Council members who had religious titles and responsibilities. In her role on the Administrative Council, she participated in discussions about suicide prevention, holding a prayer service after the Parkland mass shooting, and how Roncalli should present itself as a Catholic option for faith formation and religious education.

Roncalli uses a one-year employment contract for teachers and guidance counselors. For more than thirty years, Roncalli has included a "morals clause" in those contracts. From 2007 to 2017, the school used a contract titled, "School Teacher Contract," which required employees refrain from "any personal conduct or lifestyle at variance with the policies of the Archdiocese or the moral or religious teachings of the Roman Catholic Church." Failure to do so would result in "default under th[e] contract." An employee was also in default if she engaged in "[c]ohabitation (living together) without being legally married." The school principal and the pastor could "suspend or terminate the employment" of a defaulted employee at his or her discretion.

For the 2017–18 school year, Roncalli instituted a new employment agreement entitled "Teaching Ministry Contract." It contained the same morals clause and attached a Ministry Description detailing the responsibilities of the position. The next year, in May 2018, Starkey signed a contract titled, "School Guidance Counselor Ministry Contract," which came with the "Archdiocese of Indianapolis Ministry Description." The updated contract included a similar morals clause, but now stated that an employee was in default if the employee were to engage in a relationship "contrary to a valid marriage

as seen through the eyes of the Catholic Church," which defines marriage as between a man and a woman. Catechism of the Catholic Church ¶ 1660 (2d ed. 2016).

The accompanying Ministry Description defined the primary functions of a school guidance counselor in part as:

> Adhering to mission and within the school's supervisory structure, including the school principal and pastor or high school principal and president, the school guidance counselor will collaborate with parents and fellow professional educators to foster the spiritual, academic, social, and emotional growth of the children entrusted in his/her care.

The Ministry Description also labeled guidance counselors "minister[s] of the faith," and stated that their position included "[f]acilitat[ing] [f]aith [f]ormation." A guidance counselor's responsibilities included:

> 1. Communicates the Catholic faith to students and families through implementation of the school's guidance curriculum, academic course planning, college and career planning, administration of the school's academic programs, and by offering direct support to individual students and families in efforts to foster the integration of faith, culture, and life.

> 2. Prays with and for students, families, and colleagues and their intentions. Participates in and celebrates liturgies and prayer services as appropriate.

3. Teaches and celebrates Catholic traditions and all observances in the Liturgical Year.

4. Models the example of Jesus, the Master Teacher, in what He taught, how He lived, and how He treated others.

5. Conveys the Church's message and carries out its mission by modeling a Christ-centered life.

6. Participates in religious instruction and Catholic formation, including Christian services, offered at the school. Non-Catholic school guidance counselors are expected to participate to the fullest extent possible (e.g., non-Catholics would come forward to receive a blessing instead of Holy Communion in the Catholic Mass).

By signing the contract, Starkey acknowledged that she received the Ministry Description and agreed to fulfill "the duties and responsibilities" the agreement provided. Starkey does not dispute the text of these documents or her signatures on them. Instead, she argues that these documents do not describe either her or the school's actual conduct.

In August 2018, Starkey's colleague—the other Co-Director of Guidance—was placed on administrative leave after an Archdiocesan priest learned that she had entered a same-sex union.[3] That same month Starkey informed Roncalli's leadership that she too was in a same-sex union.

---

[3] The Archdiocese stipulated to this fact only for the purpose of summary judgment in this case.

The school permitted her to finish her contract, but at the end of the year she received a letter from the principal explaining that her employment would not be renewed for the 2019–20 school year because her conduct violated the terms of her contract. Starkey then began working as a guidance counselor at a public school for a higher salary.

In July 2019, Starkey filed a complaint alleging Roncalli and the Archdiocese violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, as well as two Indiana state tort claims against the Archdiocese. Following discovery and the dismissal of the Title IX claims, Roncalli and the Archdiocese moved for summary judgment based on the ministerial exception, Title VII's religious exemption, the Religious Freedom and Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, and other grounds. The court granted summary judgment based on the ministerial exception, without reaching the other issues. Starkey now appeals that decision on five claims: (1) Title VII Discrimination; (2) Title VII Retaliation; (3) Title VII Hostile Work Environment; (4) Intentional Interference with Contractual Relationship; and (5) Intentional Interference with Employment Relationship.

This case comes to us for de novo review of a grant of summary judgment for the defendants. *See v. Ill. Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022). We view the facts in the light most favorable to Starkey as the nonmoving party, drawing all reasonable inferences in her favor. *Id.*

## II

"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S.

CONST. amend. I. From these Religion Clauses "flow[] the ministerial exception, which 'ensures that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone.'" *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 975 (7th Cir. 2021) (en banc) (quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194–95 (2012)). Under that rule "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).

The Supreme Court unanimously endorsed the ministerial exception in *Hosanna-Tabor*. There, the Court considered a teacher's retaliation claim against an Evangelical Lutheran school under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* 565 U.S. at 177–79. When deciding whether the teacher was a minister, the Court declined to "adopt a rigid formula." *Id.* at 190. Rather, it considered all the circumstances of employment including: (1) "the formal title given" by the church; (2) "the substance reflected in that title"; (3) the individual's "own use of that title"; and (4) "the important religious functions" the individual performed for the church. *Id.* at 192. The Court noted that the school held the teacher "out as a minister, with a role distinct from that of most of its members"; her title "reflected a significant degree of religious training followed by a formal process of commissioning"; she held herself out as a minister; and her "job duties reflected a role in conveying the Church's message and carrying out its mission." *Id.* at 191–92. The Court ruled that the teacher was a minister, clarifying that the ministerial exception is "not limited to the head of a religious congregation." *Id.* at 190.

Eight years later, in *Our Lady of Guadalupe*, the Court reviewed the consolidated appeals of two Catholic school teachers who alleged they were wrongfully terminated in violation of the ADA and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* 140 S. Ct. at 2056–59. The Court held that the ministerial exception barred both suits because there was "abundant record evidence that [both teachers] performed vital religious duties." *Id.* at 2066, 2069. Even though their "titles did not include the term 'minister,' and they had less formal religious training, … their core responsibilities as teachers of religion were essentially the same." *Id.* at 2066. The teachers were "expected to guide their students, by word and deed, toward the goal of living their lives in accordance with the faith." *Id.* They prayed and attended Mass with students and "prepared the children for their participation in other religious activities." *Id.* The schools' faculty handbooks stated that the teachers "were expected to help the schools carry out this mission." *Id.*

The Court in *Our Lady of Guadalupe* also clarified how courts should apply the ministerial exception. It explained that although the factors from *Hosanna-Tabor* are relevant, they are not requirements and are not even "necessarily important" in all cases. *Id.* at 2063. Rather, "[w]hat matters, at bottom, is what an employee does." *Id.* at 2064. Implicit in *Hosanna-Tabor* "was a recognition that educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* The teacher in that case was a minister because she "had been entrusted with the responsibility of 'transmitting the Lutheran faith to the next generation.'" *Id.* at 2064 (quoting *Hosanna-Tabor*, 565 U.S. at 192). The ministerial exception should therefore include

"any 'employee' who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or *teacher of its faith*." *Id.* (quoting *Hosanna-Tabor*, 565 U.S. at 199 (Alito, J., concurring)). This rule recognizes that "[t]he religious education and formation of students is the very reason for the existence of most private religious schools." *Id.* at 2055. For that reason, the "religious institution's explanation of the role of such employees in the life of the religion in question is important." *Id.* at 2066.

## III

We consider first whether Lynn Starkey was a minister under the exception. The district court concluded that she was because Roncalli "expressly entrusted" her with "the responsibility of communicating the Catholic faith to students" and guiding the religious mission of the school.

The record supports the district court's conclusion. As the Co-Director of Guidance and a member of the Administrative Council, Starkey was one of the school leaders responsible for the vast majority of "Roncalli's daily ministry, education, and operations." She was expected to take part in the school's day-to-day operations, which included responsibilities that conveyed the Catholic faith to students, such as leading prayer over the public address system more than once. Her employment agreements and faculty handbooks recognized these job duties and responsibilities by stating that she was expected to carry out Roncalli's religious mission.

In this role, Starkey had supervisory authority over other guidance counselors. Their job included facilitating faith formation by communicating the Catholic religion to students, "modeling a Christ-centered life," and "pray[ing] with and

for students." According to the Archdiocese's Ministry Description, guidance counselors were "to foster the spiritual, academic, social and emotional growth of the children entrusted in his/her care." Those counselors contributed to Roncalli's religious mission of putting faith into action by volunteering at service projects, going on mission trips, and attending a retreat program. Starkey helped develop the criteria used to evaluate guidance counselors, which included religious components like assisting students in faith formation and attending church services. In short, Starkey was entrusted with communicating the Catholic faith to children, supervising guidance counselors, and advising the principal on matters related to the school's religious mission.

Roncalli also held Starkey out as a minister. She was identified as a "minister of the faith" in her job description and employed under a "Ministry Contract" beginning in the 2017–18 school year. Her title, Co-Director of Guidance, reflected the substance of her position, which Starkey noted in salary-related communications with school administrators. This court has consistently applied the ministerial exception in employment cases brought by teachers, music directors, press secretaries, and organists, among other positions. *See, e.g.*, *Demkovich*, 3 F.4th at 973, 985 (applying the ministerial exception to a music director, choir director, and organist's Title VII hostile work environment claim); *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655, 656 (7th Cir. 2018) (applying the exception to a Jewish day school teacher's ADA termination claim); *Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568, 569, 572 (7th Cir. 2019) (applying the exception to an organist and music director's Title VII retaliation and discrimination claims); *Alicea-Hernandez v. Cath. Bishop of Chi.*, 320 F.3d 698, 700, 702–04 (7th Cir. 2003) (applying the exception to the

Archdiocese of Chicago's Hispanic Communications Manager's Title VII discrimination claim). Under this case law, Starkey as Co-Director of Guidance qualifies as a minister.

Starkey argues that even if she were entrusted with religious responsibilities, she should not be considered a minister because she never engaged in religious matters or held a formal religious title. For example, Starkey notes that she did not speak on religious topics during Administrative Council meetings, and she would not pray or discuss religion with students during one-on-one counseling sessions. She also does not recall participating in a call-and-response prayer led by the principal. Thus, Starkey maintains that she did not act in a ministerial capacity, even if she were entrusted to do so.

This argument misunderstands the ministerial exception. What an employee does involves what an employee is entrusted to do, not simply what acts an employee chooses to perform. *See Our Lady of Guadalupe*, 140 S. Ct. at 2055 (applying the exception to an "employment dispute involving teachers at religious schools who [were] entrusted with the responsibility of instructing their students in the faith"). Under Starkey's theory, an individual placed in a ministerial role could immunize themself from the ministerial exception by failing to perform certain job duties and responsibilities. Religious institutions would then have less autonomy to remove an underperforming minister than a high-performing one. But an employee is still a minister if she fails to adequately perform the religious duties she was hired and entrusted to do. *Cf. Hosanna-Tabor*, 565 U.S. at 192 (noting "job duties" and "responsibilities" demonstrated that the teacher was entrusted with "transmitting the Lutheran faith to the next generation").

Starkey also contends the ministerial exception does not apply to her because at one point the Archdiocese's lawyers advised that guidance counselors were not ministers. Starkey cites emails from May 2016, which stated that "[s]chool counselors and social workers do not meet the definition for the ministerial exemption" for purposes of the Affordable Care Act. These emails do not support Starkey's contention. Rather, they show a lack of consensus among Weisenbach, Starkey, and the Archdiocese's lawyers over the legal definition of a minister for that Act. This confusion did not change the nature or expectations of Starkey's employment or her employment documents. Instead, the emails concerned prospective compliance with federal statutes, and neither the emails nor that Act are binding on this litigation.

Finally, Starkey asserts that Roncalli's Ministry Description and Ministry Contracts were pretextual because they were added only three months before the Archdiocese's lawyers concluded that guidance counselors did not qualify as ministers. But this ignores that the addition of a Ministry Description only made formal Starkey's role at Roncalli. For more than 30 years, Roncalli's employment contracts included a morals clause, and all evidence shows that the school considered Starkey to be a minister and entrusted her with religious duties. On this record, the changes to Roncalli's employment contracts are an honest formalization of Starkey's ongoing responsibilities. *See Sterlinski*, 934 F.3d at 571 ("The answer lies in separating pretextual justifications from honest ones. … If the court finds that the reason is honest, it does not ask whether the reason is *correct*—it is enough that the employer believe its own reason in good faith. And the burden of showing pretext rests with the plaintiff.").

We affirm the district court's decision that Starkey was a minister under the First Amendment's ministerial exception, as well as its ruling that the exception bars Starkey's three federal Title VII claims for discrimination, retaliation, and hostile work environment. We turn next to Starkey's state law claims.

**IV**

Starkey brings two Indiana state tort claims against the Archdiocese: Interference with Contractual Relationship and Intentional Interference with Employment Relationship. We must decide whether the ministerial exception applies to such state law claims.

The Supreme Court foresaw this issue in *Hosanna-Tabor* but declined to resolve it. The Court stated: "We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers. There will be time enough to address the applicability of the exception to other circumstances if and when they arise." *Hosanna-Tabor*, 565 U.S. at 196.

As the district court noted here, the doctrine of church autonomy is important to this question. In *Hosanna-Tabor*, the Court emphasized that "[r]equiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision." *Id.* at 188. Such an intrusion "interferes with the internal governance of the church" by "depriving [it] of control over the selection of those who will personify its beliefs." *Id.* But the "distinction between what falls within the protection of the church autonomy doctrine is not easily reduced to a bright-line rule." Brief of Professors as *Amicus Curiae* at 19

(citing Richard W. Garnett, *The Freedom of the Church: (Toward) an Exposition, Translation, and Defense, in* THE RISE OF CORPORATE RELIGIOUS LIBERTY 33, 50 (Micah Schwartzman et al. eds., 2015)). Instead, courts must look to the First Amendment, which "has struck the balance" between the "interest of society in the enforcement of employment discrimination statutes" and "the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Hosanna-Tabor*, 565 U.S. at 196. As we have stated, church autonomy "means what it says: churches must have 'independence in matters of faith and doctrine and in closely linked matters of internal government.'" *Demkovich*, 3 F.4th at 975 (quoting *Our Lady of Guadalupe*, 140 S. Ct. at 2061).

A year after *Our Lady of Guadalupe*, our court considered the scope of the ministerial exception in *Demkovich*. There, we held that the ministerial exception "applies to hostile work environment claims based on minister-on-minister harassment." *Id.* at 973. The decision relied on two principles from *Hosanna-Tabor* and *Our Lady of Guadalupe*. First, "although the[] cases involved allegations of discrimination in termination, their rationale is not limited to that context. The protected interest of a religious organization in its ministers covers the entire employment relationship, including hiring, firing, and supervising in between." *Id.* at 976–77 (citations omitted). Second, the ministerial exception prevents "civil intrusion and excessive entanglement," thereby reserving matters of ministerial employment for religious organizations. *Id.* at 977 (citations omitted).

Before *Hosanna-Tabor*, several circuits ruled that the ministerial exception barred state law claims. For example, in *Natal v. Christian & Missionary Alliance*, the First Circuit held that the

Free Exercise Clause barred an inquiry into a reverend's claims that his "property and contract rights were mutilated, his reputation tarnished, and his emotional health ruined." 878 F.2d 1575, 1576–78 (1st Cir. 1989). In *Bell v. Presbyterian Church (U.S.A.)*, the Fourth Circuit held that the First Amendment barred review of an even broader range of tort claims. 126 F.3d 328, 329, 333 (4th Cir. 1997). These included: (1) interference with a contract, (2) intentional infliction of emotional distress, (3) breach of the covenant of good faith and fair dealing, (4) interference with a prospective advantage, (5) wrongful termination, and (6) breach of an annual financial pledge. *Id.* at 329–30. For similar reasons, the Sixth Circuit held that it lacked jurisdiction to review a complaint that "contained claims for breach of contract, promissory estoppel, intentional infliction of emotional distress, and loss of consortium." *Lewis v. Seventh Day Adventists Lake Region Conf.*, 978 F.2d 940, 941–53 (6th Cir. 1992). *See also Hutchison v. Thomas*, 789 F.2d 392, 392–93 (6th Cir. 1986) (affirming the district court's decision to dismiss a complaint, which included claims for (1) improper application of religious provisions, (2) fraudulent or collusive or arbitrary action, (3) defamation, (4) intentional infliction of emotional distress, (5) breach of contract, and (6) loss of consortium on the minister's wife's part).

Since *Hosanna-Tabor*, one circuit has applied the ministerial exception to a breach of contract claim. *Lee v. Sixth Mount Zion Baptist Church of Pittsburgh*, 903 F.3d 113, 123 (3d Cir. 2018). In *Lee*, the Third Circuit considered a reverend's breach of contract claim, which resulted after his congregation voted to terminate his employment based on his performance. *Id.* at 116–17. The court affirmed the grant of summary judgment on ministerial exception grounds, reasoning that "the

adjudication of Lee's contract claim would impermissibly entangle the Court in religious doctrine in violation of the First Amendment's Establishment Clause." *Id.* at 116. It noted that it was "not aware of any court that has ruled on the merits (i.e., not applied the ministerial exception) of a breach of contract claim alleging wrongful termination of a religious leader by a religious institution." *Id.* at 122. But "the ministerial exception does not apply to, and courts may decide, disputes that do not implicate ecclesiastical matters." *Id.* at 123 (citation omitted).

Other circuits have held that the ministerial exception applies to state law claims more generally. For example, in *Conlon v. InterVarsity Christian Fellowship/USA*, the Sixth Circuit held that the "exception can be asserted as a defense against state law claims." 777 F.3d 829, 836 (6th Cir. 2015). Because the Religion Clauses "apply to the States through the Fourteenth Amendment by incorporation, the federal right would defeat any [state] statute that, as applied, violates the First Amendment." *Id.* This point was not disputed in *Hosanna-Tabor*, 565 U.S. at 194 n.3 ("[Respondent] does not dispute that if the ministerial exception bars her retaliation claim under the ADA, it also bars her retaliation claim under Michigan law.").

Similarly, the Ninth Circuit "has framed the exception as applicable 'to any state law cause of action that would otherwise impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers.'" *Puri v. Khalsa*, 844 F.3d 1152, 1158 (9th Cir. 2017) (quoting *Bollard v. Cal. Province of the Soc'y of Jesus*, 196 F.3d 940, 950 (9th Cir. 1999)). So, "any claim 'with an associated remedy … [that] would require the church to employ [a minister]' would 'interfer[e] with the church's

constitutionally protected choice of its ministers,' and thereby 'would run afoul of the Free Exercise Clause.'" *Id.* (alterations in original) (quoting *Bollard*, 196 F.3d at 950). The "ministerial exception also bars relief for 'consequences of protected employment decisions,' such as damages for 'lost or reduced pay,' because such relief 'would necessarily trench on the Church's protected ministerial decisions.'" *Id.* (quoting *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 966 (9th Cir. 2004)). *See also Hosanna-Tabor*, 565 U.S. at 194 ("An award of such relief would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination."); *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1027 n.2 (10th Cir. 2022) (noting it was not disputed that the ministerial exception applied to state law causes of action).

Our decision follows the lead of these other circuits. We hold that the ministerial exception applies to state law claims, like those for breach of contract and tortious conduct, that implicate ecclesiastical matters. A claim implicates ecclesiastical matters if it is "[o]f, relating to, or involving the church, esp[ecially] as an institution." *Ecclesiastical*, BLACK'S LAW DICTIONARY (11th ed. 2019). To hold otherwise would entangle courts in matters the First Amendment treats as "strictly ecclesiastical," and therefore the church's alone. *Hosanna-Tabor*, 565 U.S. at 194–95 ("The exception instead ensures that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952))); *Demkovich*, 3 F.4th at 975 (same). This holding follows the Supreme Court's guidance and aligns with the decisions of other circuits to have considered this issue. We have found no

decision that holds a contrary position on the application of the ministerial exception to state law claims, nor have the parties cited one to us.

Importantly, though, the ministerial exception is not applicable when a claim does not implicate an ecclesiastical matter. A minister who commits a tort outside the scope of employment may still be subject to liability. The same is true for a breach of contract unrelated to an ecclesiastical matter. As we have said before, "[i]f a minister's allegations rise to those levels, they may be independently actionable, as the protection of the ministerial exception inures to the religious organizations, not to the individuals within them." *Demkovich*, 3 F.4th at 982. To the best of our knowledge, "no court has held that the ministerial exception protects against criminal or personal tort liability," *id.*, and we do not hold so here.

Both of Starkey's state tort claims—Interference with Contractual Relationship[4] and Intentional Interference with Employment Relationship[5]—implicate ecclesiastical matters

---

[4] "The elements of tortious interference with a contract are as follows: (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach." *Payne-Elliott v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 180 N.E.3d 311, 324–25 (Ind. Ct. App. 2021) (citing *Duty v. Boys and Girls Club of Porter Cnty.*, 23 N.E.3d 768, 774 (Ind. Ct. App. 2014)).

[5] "To prevail on a claim of intentional interference with an employment relationship, the claimant is required to show: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from

because they litigate the employment relationship between the religious organization and the employee. Each tort contains an element which requires either a valid relationship or a valid and enforceable contract. To evaluate either claim requires review of the Church's authority over the employer, the employer-employee relationship, and the contents of the employee's contract.

Such a review would result in excessive judicial entanglement in ecclesiastical matters. State law claims may not be used to deprive a religious organization of "control over the selection of those who will personify its beliefs." *Hosanna-Tabor*, 565 U.S. at 188. Just so, nor may those claims be used to shield ministers or religious organizations from liability in cases that do not implicate ecclesiastical matters. As the Court stated in *Hosanna-Tabor*, "the First Amendment has struck the balance" between the "interest of society in the enforcement of employment discrimination statutes" and "the interest of religious groups in choosing who will preach their beliefs, teach their faith, and carry out their mission." *Id.* at 196. Applying the ministerial exception to Starkey's state tort claims does not disrupt or change that balance. Rather, it respects the "special solicitude" the First Amendment provides to religious organizations without shielding them from liability in non-ecclesiastical matters. *Id.* at 189.

Because Starkey was a minister, the district court correctly determined that both of Starkey's state tort claims are barred by the First Amendment's ministerial exception.

---

defendant's wrongful interference with the relationship." *Id.* at 325 (citing *City of Lawrence Utils. Serv. Bd. v. Curry*, 68 N.E.3d 581, 588–89 (Ind. 2017)).

**V**

Starkey was a minister because she was entrusted with communicating the Catholic faith to the school's students and guiding the school's religious mission. The ministerial exception bars all her claims, federal and state. This opinion therefore does not reach the parties' Title VII, RFRA, or other constitutional arguments. We AFFIRM the district court.

EASTERBROOK, *Circuit Judge*, concurring. It is a stretch to call a high school guidance counsellor a minister. Even if the school expects counsellors to pray with students and discuss matters of faith with them, the job is predominantly secular. Designating the position as a minister by contract cannot be called pretextual, however, so I do not object to the majority's conclusion. See *Sterlinski v. Catholic Bishop of Chicago*, 934 F.3d 568, 571 (7th Cir. 2019).

I am concerned, however, by what seems to have become the norm in cases of this kind: starting with a constitutional question under *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 565 U.S. 171 (2012), rather than with the statute, which is the proper sequence. See, e.g., *New York City Transit Authority v. Beazer*, 440 U.S. 568, 582 (1979). The principal statutory question here is whether the Diocese is entitled to the benefit of the exemption in §702(a) of the Civil Rights Act of 1964, which provides:

> This subchapter shall not apply to … a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. §2000e–1(a). "This subchapter" refers to Title 42, Chapter 21, Subchapter VI, which comprises all of Title VII. The Diocese is a religious association, and the high school is a religious educational institution. Any temptation to limit this exception to authorizing the employment of co-religionists, and not any other form of religious selectivity, is squelched by the definitional clause in §2000e(j), which tells us that religion includes "all aspects of religious observance and practice, as well as belief". (Section 2000e–2(e)(2) separately

provides an exemption for employment of co-religionists by schools and colleges affiliated with religious groups.)

A straightforward reading of §2000e–1(a), coupled with §2000e(j), shows that the Diocese was entitled to fire Starkey without regard to any of the substantive rules in Title VII. It is undisputed that the Roman Catholic Church deems same-sex marriages improper on doctrinal grounds and that avoiding such marriages is a kind of religious observance. Same-sex marriages are lawful in secular society and are protected by Title VII when its rules apply, see *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), but are forbidden by many religious faiths. Section 702(a) permits a religious employer to require the staff to abide by religious rules. A religious school is entitled to limit its staff to people who will be role models by living the life prescribed by the faith, which is part of "religion" as §2000e(j) defines that word.

So why isn't §702(a) the first issue considered in all Title VII suits alleging discrimination by a religious organization? The answer may be that courts of appeals say that the exemption permits religious discrimination but no other kind. That the exemption permits religious associations to discriminate on religious grounds is plain enough. See *Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327, 329 (1987). But where does the "no other kind" limitation come from? Decisions such as *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011), which states that "Section 2000e–1(a) does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin", do not explain why "this subchapter" means something less than all of Title VII. See also, e.g., *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972); *EEOC v. Townley*

*Engineering & Manufacturing Co.*, 859 F.2d 610, 616 (9th Cir. 1988); *Fratello v. Archdiocese of New York*, 863 F.3d 190, 200 n.21 (2d Cir. 2017). Some decisions, such as *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1167 (4th Cir. 1985), mention legislative history, but not any that illuminates the meaning of "this subchapter".

Maybe what these decisions are getting at is that §702(a) does not exempt all employment decisions by religious organizations. The decision must itself be religious, as that word is defined in Title VII. This means, for example, that sex discrimination unrelated to religious doctrine falls outside the scope of §702(a). But when the decision is founded on religious beliefs, then all of Title VII drops out. I cannot imagine any plausible reading of "this subchapter" that boils down to "churches can discriminate against persons of other faiths but cannot discriminate on account of sex". One function of §702(a) is to permit sex discrimination by religions that do not accept women as priests. The exemption does this by declaring all of "this subchapter" to be inapplicable. (Perhaps the "bona fide occupational qualification" exemption in §2000e–2(e)(1) also covers a rule against female clergy, but §702(a) seems a better fit for this role.)

Anyway, how could one distinguish religious discrimination from sex discrimination in Starkey's situation? Firing people who have same-sex partners is sex discrimination, *Bostock* holds. See also *Hively v. Ivy Tech Community College*, 853 F.3d 339 (7th Cir. 2017) (en banc). But it is also religious discrimination. The Diocese is carrying out its theological views; that its adherence to Roman Catholic doctrine produces a form of sex discrimination does not make the action less religiously based.

The block quotation above omits part of the exemption's language. The omitted words say that the subchapter "shall not apply to an employer with respect to the employment of aliens outside any State". That language has been understood to mean what it says: *none* of Title VII's substantive rules applies to aliens covered by §702(a). See, e.g., *Rabé v. United Air Lines, Inc.*, 636 F.3d 866, 869 (7th Cir. 2011). What is true for the alien exemption must be true for the religious exemption as well.

Our circuit has never embraced the position that §702(a) permits religious discrimination but not sex discrimination that has a religious footing. Section 702(a) will not resolve all claims made by employees of religious organizations, but it resolves many—including Starkey's.