# IN THE SUPREME COURT OF IOWA

No. 21–1275

Submitted February 21, 2023—Filed April 14, 2023

**PHYLLIS KONCHAR,**

Appellant,

vs.

**JOSEPH PINS, ST. JOSEPH'S CHURCH OF DES MOINES,** and **THE ROMAN CATHOLIC DIOCESE OF DES MOINES,**

Appellees.

---

Appeal from the Iowa District Court for Polk County, Sarah Crane, Judge.

A former principal of a Catholic school appeals the dismissal of her fraud, defamation, and breach of contract claims. **AFFIRMED.**

May, J., delivered the opinion of the court, in which all justices joined. Waterman, J., filed a concurring opinion, in which McDermott, J., joined.

Mark D. Sherinian (argued) and Emily E. Wilson of Sherinian & Hasso Law Firm, Des Moines, for appellant.

Brianna L. Long (argued), Frank Harty, and Haley Hermanson of Nyemaster Goode, P.C., Des Moines, for appellees.

**MAY, Justice.**

Phyllis Konchar was the principal at St. Joseph's Catholic School for nineteen years. After her employment was terminated, Konchar brought suit against St. Joseph's Church, a priest, and the Des Moines Diocese. The district court granted summary judgment to the defendants as to Konchar's fraud claim, her breach of contract claim, and one of her defamation claims. A jury returned defense verdicts on Konchar's remaining defamation claims. Konchar appeals.

Following our review, we conclude that Konchar has not shown grounds for reversal. We affirm.

### I. Background Facts and Proceedings.

**A. St. Joseph's School.** St. Joseph's School is a Catholic school operated by St. Joseph's Church, a juridical entity in the Roman Catholic Diocese of Des Moines. A priest administers the church and school. The priest is appointed by and subordinated to the Bishop of the Diocese. The Bishop is appointed by and subordinated to The Pope.

**B. Catholic Schools and Their Principals.** According to The Diocese of Des Moines Catholic Schools Personnel Handbook, "Catholic schools exist to enable students to learn the traditions and doctrines of the Catholic Church and to carry out the Gospel message of Jesus Christ in their daily lives." In describing the "roles and responsibilities" of a school's principal, the Handbook notes that "[i]n Catholic schools, the principal functions as *the spiritual*, academic, managerial, communications and public relations *leader of the school.*" (Emphasis added.) As "spiritual leader," the principal

A. Evidences the value and qualities of a Catholic school education.

B. Demonstrates an active faith life personally and professionally.

C. Provides leadership for the ongoing building of the school as a faith community.

D. Provides opportunities and participates in prayer, prayer services, liturgical celebrations, and reception of the sacraments.

E. Models and expects Gospel values and Christian behavior throughout the school.

F. Communicates the mission of the school as a ministry of the church and parish.

**C. Phyllis Konchar.** In the fall of 1999, Phyllis Konchar became principal of St. Joseph's Catholic School. She served in this role for nineteen years. As will be explained below, Konchar's employment was terminated on March 9, 2018. At the time of her termination, Konchar's employment was governed by an annual administrator contract for the period of August 1, 2017, to July 31, 2018. The administrator contract allowed for Konchar to be terminated for "cause," which the contract defined to include "performance, conduct or behavior on the part of the employee which, in the sole opinion of the employer, adversely affects the desirability of continued employment."

**D. Pastor Pins.** In 2017, Bishop Richard Pates was the Bishop for the Diocese. Bishop Pates appointed Father Joseph Pins as St. Joseph Parish Priest in July 2017. This role gave Father Pins authority over staff at St. Joseph's School, including principal Konchar.

Soon after Father Pins's appointment, he learned of several problems involving Konchar. For example, a gym teacher filed a written complaint against

Konchar for harassment. And when a music teacher decided to resign, she sent an email to Father Pins stating that "it was [Konchar's] bullying that made me leave." Current and former employees told Father Pins that the work environment was "toxic."

There were other worries, too. Konchar hired an employee for the school office after Father Pins specifically told her not to. And Konchar paid an employee extra money out of her own personal account. Also, the Iowa Department of Education notified the school that it would be audited concerning the free-and-reduced-lunch program. A business manager believed Konchar had approved applications that were noncompliant because the families' incomes had been too high to qualify for the program.

In light of these and other concerns, the Diocese's human resources director began an investigation of Konchar in the fall of 2017. Also, in November 2017, Father Pins issued a performance improvement plan (PIP) to Konchar. It identified four areas of concern: "insubordination," "different treatment of employees," "a culture of fear and intimidation," and "a lack of collaboration with parish staff."

Konchar viewed the PIP as a threat to her continued employment. In response, Konchar used the school's electronic messaging system—called "Dojo"—to ask parents to attend the December 7 board of education meeting and "support Principal Konchar's future employment." Later, she sent a follow-up message stating that the meeting had been canceled but to direct any communication "to Father Pins."

In December, Bishop Pates suggested that Father Pins and Konchar should try a form of mediation. Father Pins and Konchar met with mediator Tom Green on several occasions between December 2017 and February 2018. Together, they created a document entitled "Building Agreements." Among other things, the "Building Agreements" document included a list of "Our Agreements." The list included a wide range of items, such as: "Keep each other informed," "Support each other's success," "No tip toing around each other," "Eliminate the drama," and "Get to know each other better—our human sides." Significant to this appeal, the list also included this item:

> Fr. Pins' agreement to Phyllis. *I want to* offer you my support, celebrate your success and help you reach your leadership goals; *help you reach your retirement plans on your terms*. Asks her to trust him.

(Emphases added.)

Konchar and Father Pins signed the "Building Agreements" document on February 22.

While Konchar and Father Pins were mediating, the Diocese's human resources' investigation continued. On March 9, the human resources director sent a letter to Konchar that explained:

> The Diocese of Des Moines Human Resources department conducted an investigation into a complaint that was received about you. Individuals including current and former employees of Saint Joseph School as well as former pastors were interviewed.

> Based upon the investigation, the office concluded that you are alleged to have engaged in conduct that exposed Saint Joseph to risks associated with potential violations of the Iowa Wage Payment Collections Act (Iowa Code Chapter 91A) and the Iowa Black Listing Law (Iowa Code Chapter 730.2).

The investigation did not pass judgment on whether you violated these laws. The investigation focused on the exposure that was created and the environment that was fostered.

On the same day, Father Pins informed Konchar that her contract would not be renewed for the next school year. He told Konchar that she could finish out the school year if she did not disclose this decision.

Konchar chose to speak out. That afternoon, she sent out this Dojo message to parents and staff:

> Dear Parents,
>
> I was informed by Father Pins today that my contract would not be renewed next year. He further stated that I would be terminated immediately if I contacted parents, staff, or the board of education and told them about his decision. As you can tell, I have made the decision to be terminated. It has been my privilege to serve you and your children. I wish you all of the best.
>
> Sincerely,
>
> Phyllis Konchar.

Many parents responded with support for Konchar. At least one parent started a petition to reinstate Konchar.

On March 11, Father Pins sent an email to the "St. Joseph Parish and School Community":

> I regret having to send this message. As many of you may know, Ms. Konchar and I have philosophical differences of opinion regarding the church and school. We were working toward developing a cooperative relationship when I received complaints from a number of current and former staff. With the assistance of the diocese, these concerns were examined. *We concluded that there was a pattern of conduct that warranted choosing not to renew Ms. Konchar's contract.* I informed Ms. Konchar of this decision and asked her to maintain the decision in confidence and in a professional manner. She shared with me that she had the right to

tell the world – and she apparently has attempted to do so. In response she was let go.

There's apparently a perception that this decision was the product of animosity between Ms. Konchar and me. *Please be advised that the prior two pastors, were consulted and Bishop Pates approved the decision following the evaluation of the past conduct.*

You probably know that in situations like this the church and Ms. Konchar's employer have to maintain a level of discretion. The best action at this time is for prayer for Ms. Konchar, myself, and all associated with the parish. We pray especially for St. Joseph School and its students who are the most important consideration at this time.

Sincerely,

Fr. Joe Pins

(Emphases added.)

The next day, March 12, Konchar sent out another Dojo message. This time, Konchar responded to Father Pins's March 11 email, which she described as "outrageous":

Dear Parents,

This will probably be my last post, as I'm sure Father Pins will find a way to block me from this account. My email was deactivated Friday, but my personal email is . . . .

You may have received the outrageous email from Father yesterday. First of all, he cannot discuss any personnel matters as they are confidential.

For full disclosure, there were two complaints filed against me by two employees who left abruptly. This was investigated by the Diocese, as it should be, and was determined to be unfounded. This unfounded accusation was his "rationale" for termination. But really, he has not liked me since he came. He has been working toward this since last July and was finally able to accomplish what he and Paula have wanted. It's hard for them to have someone who will stand up to them. Frankly, he has no knowledge about School, about children, about humanity.

You certainly have a snapshot of his bizarre behavior that I have dealt with all year. He gave me a document February 22 which stated he would like me to remain at St. Joseph's until my retirement, then terminated me March 9th.

I will pray for all of you. I am beyond humbled, blessed, and grateful for your kind words on the petition and for your support.

I love you all,

Phyllis Konchar.

Also on March 12, the Diocese of Des Moines issued a press release. It stated:

An investigation by the Diocese of Des Moines was conducted at St. Joseph School regarding the school administrator after a series of internal concerns were presented to the diocese.

*The outcome of the investigation pointed to serious irregularities in the school administration under her direction.* The principal was advised of these and invited to remain in place for the remainder of the school year on the condition that the situation remain private. She chose otherwise.

The parish and school community regret this turn of events but assure Mrs. Phyllis Konchar of appreciation for her 19 years of service to the school, wish her well and assure her of our prayers.

(Emphasis added.) That evening, the story of Konchar's firing was on the Des Moines Register's webpage. The Register story mentioned that some "parents are petitioning to have" Konchar reinstated. According to the Register story, though, "Konchar said she would accept the principal position again only if the current priest left."

**E. Procedural History.** In May 2018, Konchar commenced this action against Father Pins, St. Joseph's Church, and the Diocese of Des Moines. She alleged fraud and defamation by all defendants. She alleged breach of contract against Father Pins only.

Konchar's claims of fraud and breach of contract were based on statements in the "Building Agreements" document. Konchar's defamation claims were based on statements in Father Pins's email of March 11 and the Diocese's press release of March 12.

After extensive discovery, the defendants moved for summary judgment. The district court denied the motion as to Konchar's defamation and fraud claims. But the court granted summary judgment as to Konchar's breach of contract claim. Among other things, the court found that the "Building Agreements" language was "not sufficiently definite or certain as to be enforceable" as a contract.

Discovery continued. In February 2020, Konchar filed a motion to compel. Konchar asked the court to inspect *in camera* certain documents that the defendants had withheld under attorney–client privilege. Konchar claimed that the documents may be discoverable under the crime-fraud exception. The court denied this motion.

Later, the defendants renewed their request for summary judgment. The court granted summary judgment as to Konchar's fraud claim (and Konchar does not appeal that ruling). The court also granted summary judgment as to Konchar's claim that she had been defamed by the statement in Father Pins's March 11 email that "the prior two pastors, were consulted." But the court denied summary judgment as to Konchar's claim that she had been defamed by Father Pins's statement (in the same email) that "there was *a pattern of conduct* that warranted choosing not to renew Mrs. Konchar's contract." (Emphasis

added.) The court also denied summary judgment as to Konchar's claim that she had been defamed by the statement in the Diocese's March 12 press release that its "investigation pointed to *serious irregularities in the school administration under* [Konchar's] direction." (Emphasis added.) So the case went to trial on those two defamation claims.

The trial spanned from August 2 to August 13. Thirty-six witnesses testified. Over 100 exhibits were admitted. Ultimately, the jury returned defense verdicts on both defamation claims. The court entered judgment on the verdict. This appeal followed.

## II. Analysis.

Konchar raises four issues on appeal. She contends the district court (1) erred in granting summary judgment as to the breach of contract claim, (2) abused its discretion by denying her motion to compel, (3) erred in granting summary judgment as to the "two pastors" defamation claim, and (4) abused its discretion by admitting certain evidence. The defendants deny that Konchar has shown any reversible error. Additionally, the defendants raise an alternative basis to affirm, namely, that all of Konchar's claims were barred under the ecclesiastical abstention doctrine.

**A. Breach of Contract Claim.** We start with Konchar's breach of contract claim. Konchar argues that the district court erred by granting summary judgment as to this claim. We disagree.

We review summary judgment rulings for correction of errors at law. *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 36 (Iowa 2018).

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact.' " *Id.* (quoting *Walderbach v. Archdiocese of Dubuque, Inc.*, 730 N.W.2d 198, 199 (Iowa 2007)). "When reviewing a district court's ruling, we view the record in the light most favorable to the nonmoving party." *Id.*

Of course, "to prove a breach of contract claim, a party must show . . . 'the existence of a contract.' " *Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110–11 (Iowa 2013) (quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). For a contract to be enforceable, its "terms must be sufficiently definite for the court to determine the duty of each party and the conditions of performance." *Royal Indem. Co. v. Factory Mut. Ins.*, 786 N.W.2d 839, 846 (Iowa 2010). "[W]e look for terms with precise meaning that provide certainty of performance." *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 286 (Iowa 1995). This inquiry presents "a question of law." *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001).

Konchar claims that an enforceable contract arose from this statement in the "Building Agreements" document:

> Fr. Pins' agreement to Phyllis. *I want to* offer you my support, celebrate your success and help you reach your leadership goals; *help you reach your retirement plans on your terms.* Asks her to trust him.

(Emphases added.)

The district court concluded that this language was "not sufficiently definite or certain as to be enforceable." We agree. This language includes no

"terms with precise meaning that provide certainty of performance." *Anderson*, 540 N.W.2d at 286. It does not allow us "to determine the duty of each party and the conditions of performance." *Royal Indem. Co.*, 786 N.W.2d at 846. It was not, as Konchar suggests, a promise of tenure-like immunity from termination. It contained no guarantee that her employment would continue until some unspecified time when Konchar decided to retire. Rather, it speaks only of Father Pins's desire ("I want . . . .") to "help" Konchar. And it does not specify Konchar's "retirement plans" or what it would mean for her to "reach" those plans "on [her] terms." Indeed, Konchar concedes that "the manner in which Rev. Pins might have helped Ms. Konchar reach her retirement plans was not specified."

All things considered, then, we agree with the defendants that the "Building Agreements" document is better characterized as aspirational than contractual. It is a statement of shared aspirations to improve a working relationship. It uses terms like "Shared Vision" and "Shared Goals." It describes goals like: "Keep each other informed," "Support each other's success," "No tip toing around each other," "Eliminate the drama," and "Get to know each other better—our human sides." It speaks of "[m]ov[ing] away from hearts at war" and towards "hearts at peace." Its "informal" statements "expressing goodwill and hope for association are too vague to be enforceable as contract provisions." *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1441 (7th Cir. 1992) (applying Illinois law).

Although our analysis of the document's text is dispositive, we note that context also supports the district court's ruling. As the court noted:

It is undisputed that Plaintiff served as Principal of the School pursuant to the terms of a written administrator contract. Nothing in the administrator contract guaranteed Plaintiff the right to work for the School as Principal until any specific "retirement" date. Instead, Plaintiff worked under a one-year contract that terminated on July 31, 2018, unless earlier terminated. It defies credibility or common sense to suggest that there was a meeting of the minds between the parties that by executing the mediation document on February 22, 2018, the parties intended to amend the administrator contract to, in essence, guarantee Plaintiff employment until some unspecified retirement date.

Because Konchar failed to show that the "Building Agreements" document was an enforceable contract, the district court was right to dismiss Konchar's breach of contract claim.

**B. Attorney–Client Privileged Documents.** Konchar claims that the district court abused its discretion by refusing to conduct an *in camera* review of certain attorney–client communications. *Keefe v. Bernard*, 774 N.W.2d 663, 667 (Iowa 2009) (applying abuse of discretion standard for motions to compel discovery). We disagree.

Iowa's attorney–client privilege is codified at Iowa Code section 622.10 (2018). "Any confidential communication between an attorney and the attorney's client is absolutely privileged from disclosure against the will of the client." *Keefe*, 774 N.W.2d at 669 (quoting *Shook v. City of Davenport*, 497 N.W.2d 883, 886 (Iowa 1993), *abrogated by Wells Dairy, Inc. v. Am. Indus. Refrigeration, Inc.*, 690 N.W.2d 38, 44–45 (Iowa 2004)). The privilege is "of ancient origin" and "is premised on a recognition of the inherent right of every person to consult with legal counsel and secure the benefit of his advice free from any fear of disclosure."

*Id.* (quoting *Bailey v. Chicago, Burlington & Quincy R.R.*, 179 N.W.2d 560, 563 (Iowa 1970)).

Like other courts, though, we have recognized an exception for "communications by one contemplating crime or the perpetration of fraud to an attorney for advice as to how to succeed." *State v. Kirkpatrick*, 263 N.W. 52, 55 (Iowa 1935). As the district court noted, however, there is relatively little Iowa caselaw about the crime-fraud exception. The parties appear to agree that Iowa's exception is equivalent to the federal version. We assume without deciding that this is correct. *See Kuehl v. Tegra Corp.*, No. 21–0416, 2022 WL 2155269, at *5 (Iowa Ct. App. June 15, 2022) (relying on federal authority to describe the crime-fraud exception).

As the United States Supreme Court has explained, "the purpose of the crime-fraud exception" is "to assure that the 'seal of secrecy,' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *United States v. Zolin*, 491 U.S. 554, 563 (1989) (citation omitted) (quoting *O'Rourke v. Darbishire*, [1920] AC 581, 604 (PC)). "Because the attorney–client privilege benefits the client, it is the client's intent to further a crime or fraud that must be shown." *In re BankAm. Corp. Secs. Litig.*, 270 F.3d 639, 642 (8th Cir. 2001).

"Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, 'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' that *in camera* review of the materials may reveal evidence to establish the claim that the

crime-fraud exception applies." *Zolin*, 491 U.S. at 572 (quoting *Caldwell v. Dist. Ct.*, 644 P.2d 26, 33 (Colo. 1982)). Even if this showing is made, the district court still has discretion in determining whether *in camera* review is appropriate. *Id.* When exercising this discretion, the court should consider "the facts and circumstances of the particular case," including "the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply." *Id.*

Applying these principles here, we find no grounds for reversal. To begin with, the defendants point out that any arguments about a "crime fraud" exception may be moot now because Konchar's fraud claim was dismissed and Konchar has not appealed that ruling. And while Konchar's appellate brief asks us to consider expanding the exception to torts other than fraud, we agree with the defendants that this argument was not preserved below. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we decide them on appeal." *State v. Trane*, 984 N.W.2d 429, 434–35 (Iowa 2023) (quoting *State v. Bynum*, 937 N.W.2d 319, 324 (Iowa 2020)). It does not appear that the district court ruled on a possible expansion of the exception to nonfraud torts. Rather, the district court only ruled on whether the traditional crime-fraud exception applied.

And as to that ruling, we can find no error. Konchar claims that the district court should have reviewed attorney–client emails because one of the defendants' attorneys provided the defendants with advice and counsel as to many of the decisions at issue in Konchar's suit, including Bishop Pates's request that Father

Pins and Konchar participate in mediation, the Diocese's investigation of allegations against Konchar, the decision to terminate Konchar, and the wording of the statements issued by Father Pins and the Diocese. Konchar argues that the attorney's "involvement in the decisions to terminate" Konchar "after the successful mediation," plus the attorney's "participation in the investigation and his drafting of the press releases [sic] was a sufficient prima facie showing upon which" the district court "should, at a minimum, have reviewed" the emails *in camera.*

We disagree. Konchar failed to make any initial showing that any privileged communications were made in furtherance of a crime or fraud by the defendants. *See In re BankAm. Corp.*, 270 F.3d at 642 ("There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud."); *Rabushka ex rel. U.S. v. Crane Co.*, 122 F.3d 559, 566 (8th Cir. 1997) ("[Plaintiff] merely offered his general theory that a fraud occurred and asserted that any communications made aided that fraud, a showing that does not satisfy the requirements of the crime-fraud exception or justify *in camera* review."). So the district court had no reason to intrude on the privilege by reviewing attorney–client communications. There was no abuse of discretion.

**C. "Two Pastors" Defamation Claim.** Konchar contends that the district court erred by granting summary judgment as to her defamation claim concerning Father Pins's "two pastors" statement. As noted, this statement

appeared in Father Pins's March 11 email to the school and parish community.

Here is an excerpt:

> There's apparently a perception that this decision was the product of animosity between Ms. Konchar and me. *Please be advised that the prior two pastors, were consulted* and Bishop Pates approved the decision following the evaluation of the past conduct.

(Emphasis added.)

We conclude that the court was right to dismiss the "two pastors" defamation claim. *Bandstra*, 913 N.W.2d at 36 (reviewing for correction of errors at law). As the defendants rightly observe, "there can be no defamation without a false statement." And substantial truth is an established defense to a defamation claim.[1] *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 769 (Iowa 2006). As one observer noted:

> A defendant does not have to prove the literal truth of a defamatory statement to prevail. An effective defense can rely on the substantial truth doctrine. The substantial truth doctrine states that "[t]ruth will protect the defendant from liability even if the precise literal truth of the defamatory statement cannot be established," as long as the "gist" or "sting" of the statement is true.

> A crisp formulation of the doctrine states that a publication is substantially true if (a) it is factually similar to the literal truth, and (b) it differs from the truth by no more than immaterial details. A statement differs from the truth "by no more than immaterial details" if the statement does not harm the plaintiff's reputation more than would the pleaded truth.

---

[1]Although defendants' brief does not ask us to affirm on substantial truth grounds, that theory was raised and litigated below and, therefore, we may rely on it to affirm. *King v. State*, 818 N.W.2d 1, 12 (Iowa 2012) (noting "[o]ur rules provide that an appellee need not even file a brief in our court"; further noting "we may choose to consider only grounds for affirmance raised in the appellee's brief, but we are not required to do so, so long as the ground was raised below").

Meiring de Villiers, *Substantial Truth in Defamation Law*, 32 Am. J. Trial Advoc. 91, 99–100 (2008) (alteration in original) (footnotes omitted).

Here it is undisputed that—indeed—Father Pins did consult with the two prior pastors about Konchar. And both pastors shared concerns about Konchar. So, to the extent Konchar's claim depends *solely* on whether Father Pins "consulted" with the "two pastors," her claim fails under the substantial-truth doctrine.

But in some of Konchar's filings, and again at oral argument, Konchar has suggested that her defamation claim is not *just* about whether Father Pins consulted with the two pastors. Consultation alone is not the "gist" or "sting," she suggests. *Id.* Indeed, Konchar appears to concede that Father Pins did consult with the pastors in the fall of 2017. Rather, Konchar's claim is about what happened in *2018.* Konchar believes that Father Pins's "two pastors" statement falsely implied that the two pastors *approved of her 2018 firing* even though—according to their deposition testimony—the pastors weren't even consulted in 2018. So the "two pastors" statement was defamatory, Konchar believes, because it created the false appearance that Father Pins had valid reasons to fire her when—in fact—he had no valid reasons at all. Instead, Konchar believes, Father Pins simply didn't like her.

Ultimately, then, Konchar's defamation claim is about whether a Catholic priest was justified in deciding that Konchar should no longer serve as principal at a Catholic school. But the district court believed that this kind of inquiry would run afoul of the First Amendment's Free Exercise Clause. *See Koster v.*

*Harvest Bible Chapel–Quad Cities*, 959 N.W.2d 680, 687 (Iowa 2021) (noting the general rule "that religious controversies are not the proper subject of civil court inquiry" (quoting *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 713 (1976))); *Kliebenstein v. Iowa Conf. of United Methodist Church*, 663 N.W.2d 404, 407 (Iowa 2003) (noting the "general rule that '[d]efamation actions are precluded by the First Amendment when an examination of the truth of the allegedly defamatory statements would require an impermissible inquiry into church doctrine and discipline'" (alteration in original) (quoting 50 Am. Jur. 2d *Libel and Slander* § 117, at 420 (1995))). In fact, the district court specifically found that the First Amendment precludes inquiries by "a civil court" into "the decision of whether Konchar was suitable for the role of Principal at St. Joseph's." And Konchar's briefs do not challenge this conclusion.[2] So we presume without deciding that the district court was correct, and we decline to reverse. *McKinney v. Hartman*, 3 Iowa (Clarke) 344, 345 (1856) ("The presumption is, that the ruling was correct, and it is for the party alleging error, to show it affirmatively. This has been too frequently settled to be now questioned."); *see Struve v. Struve*, 930 N.W.2d 368, 378 (Iowa 2019) (noting the "burden rests upon the appellant . . . to establish error" (quoting *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 140 (Iowa 2013))); *State v. Cook*, 330 N.W.2d 306, 313

---

[2]Konchar's opening brief focuses on the factual issue of whether Father Pins's "two pastors" comment was about 2017 conversations with the pastors or, instead, events that occurred in 2018. Konchar's opening brief also discusses the qualified privilege—although the district court did not rely on qualified privilege in dismissing the "two pastors" claim. Konchar's reply brief claims that a jury would not have to determine whether the two prior pastors had "in fact approved the non-renewal decision" because the "only issue" is "whether the two priests were consulted at all."

(Iowa 1983) ("We do not presume error."); *In re Behrend's Will,* 10 N.W.2d 651, 655 (Iowa 1943) ("Errors are not presumed . . . ."); *Cent. Tr. Co. v. City of Des Moines,* 216 N.W. 41, 42 (Iowa 1927) ("Error is not presumed.").

**D. Evidentiary Issues.** Konchar also argues that the district court abused its discretion by allowing certain testimony of a former administrative assistant at St. Joseph's (Tanya Dunn), four former St. Joseph's teachers (Jill Dotson, Autumn O'Connor, Jenny Gervais, and Natalie Bradley), and a former member of St. Joseph's Board of Education (Richard Carpenter). Each of these witnesses testified about Konchar's reputation and behaviors in her role as principal, including some negative aspects. Konchar argues that the district court abused its discretion by admitting certain negative comments about her because (1) the defendants "failed to establish the foundation" for these witnesses' opinions and (2) the witnesses' descriptions of specific conduct were not "relevant to the character trait at issue."

We review evidentiary challenges for an abuse of discretion. *State v. Thompson,* 954 N.W.2d 402, 406 (Iowa 2021). Moreover, "the erroneous admission of evidence does not require reversal 'unless a substantial right of the party is affected.'" *Mohammed v. Otoadese,* 738 N.W.2d 628, 633 (Iowa 2007) (quoting Iowa R. Evid. 5.103(*a*)). "[T]he burden rests upon the appellant not only to establish error but to further show that prejudice resulted." *Jones,* 836 N.W.2d at 140 (alteration in original) (quoting *In re Behrend's Will,* 10 N.W.2d at 655).

Following our review, we are not convinced that Konchar has shown an abuse of discretion in the district court's evidentiary determinations. In any

event, even if we assume that the evidence identified by Konchar should have been excluded, Konchar still hasn't shown "that prejudice resulted." *Id.* (quoting *In re Behrend's Will*, 10 N.W.2d at 655). Thirty-six witnesses testified in this ten-day trial. Over 100 exhibits were admitted. Konchar's complaints involve a relatively small segment of the total evidence. Moreover, much of the evidence that troubles Konchar was effectively duplicated by other evidence. All things considered, we believe Konchar received a fair trial. We decline to order another.

### III. Conclusion.

Konchar has shown no grounds for reversal. We affirm.

**AFFIRMED.**

Waterman, J., files a concurring opinion, in which McDermott, J., joins.

**WATERMAN, Justice (concurring).**

I join the majority opinion in full. I write separately to confirm the majority opinion leaves the door open to formally apply the ministerial exception in our state. I would apply that exception in this case as an alternative ground to affirm dismissal of all tort claims asserted by Phyllis Konchar related to her termination as principal and "spiritual leader" of this church-operated private school. The ministerial exception better protects the autonomy of religious organizations guaranteed under the First Amendment to choose who ministers their faith and spares churches, dioceses, priests, and bishops the entanglement with costly civil litigation this case exemplifies. The extensive discovery, depositions, and trial spanning two weeks that these church defendants endured could have been avoided by a prompt dispositive motion under the ministerial exception long recognized by the United States Supreme Court, federal circuit courts, and other state courts.

The religion clauses of the First Amendment guarantee religious institutions the freedom to exercise their religion without interference from secular authority. *See* U.S. Const. amend. I; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 194 (2012). The enactment of Title VII, which prohibits discrimination in employment on the basis of sex, race, ethnicity, national origin, or religion, presented a dilemma: applying Title VII to religious institutions would mean those institutions at times could not exercise their religion in the employment context without risking civil liability. *See*

*Hosanna-Tabor*, 565 U.S. at 185. The federal circuits developed the ministerial exception as the means to harmonize the protections of Title VII with the freedom guaranteed by the First Amendment. *See id.* at 188; *McClure v. Salvation Army*, 460 F.2d 553, 560 (5th Cir. 1972) (excepting, for the first time, the employment relationship between a religious institution and its ministers from the reach of Title VII). Federal courts have applied the ministerial exception beyond Title VII to bar state law claims as well. *E.g., Starkey v. Roman Cath. Archdiocese of Indianapolis, Inc.*, 41 F.4th 931, 944–45 (7th Cir. 2022) (affirming summary judgment dismissing tortious interference claims). We should do the same.

Today, the ministerial exception gives practical effect to the constitutional guarantee by ensuring "that the authority to select and control who will minister to the faithful—a matter 'strictly ecclesiastical'—is the church's alone." *Hosanna-Tabor*, 565 U.S. at 195 (citation omitted) (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 119 (1952)). This is so because the process of choosing ministers is more than just an employment decision. *Id.* at 188. It implicates the faith and belief of individuals as well as the mission of the religious institution. *Id.*

Accordingly, the ministerial exception applies to employees performing a ministerial role. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2063 (2020). There are two dimensions to the application. First, the exception protects the employment decision itself. *See Sumner v. Simpson Univ.*, 238 Cal. Rptr. 3d 207, 223 (Ct. App. 2018). It does not turn on the motivation or reasoning behind the decision. *Id.* Inquiring into the motivation or reasoning would require

the sort of entanglement that the First Amendment prohibits and the exception avoids. *See id.* ("[T]he state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content." (quoting *Schmoll v. Chapman Univ.*, 83 Cal. Rptr. 2d 426, 430 (Ct. App. 1999))).

Second, determining whether an employee is a "minister" focuses on function, not form; duties, not title. *Our Lady of Guadalupe*, 140 S. Ct. at 2064 ("What matters, at bottom, is what an employee does."). This means the ministerial exception will cover more people than just those who have been ordained. *See, e.g., id.* (parochial school teachers); *Starkey*, 41 F.4th at 937–38 (parochial school guidance counselor); *Gunn v. Mariners Church, Inc.*, 84 Cal. Rptr. 3d 1, 3 (Ct. App. 2008) (worship director); *Rehfield v. Diocese of Joliet*, 182 N.E.3d 123, 142 (Ill. 2021) (parochial school principal); *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 611 (Ky. 2014) (seminary professor). *But see Archdiocese of Wash. v. Moersen*, 925 A.2d 659, 669–70 (Md. 2007) (holding a church organist does not qualify as a minister); *see also Smith v. Raleigh Dist. of N.C. Conf. of United Methodist Church*, 63 F. Supp. 2d 694, 710 (E.D.N.C. 1999) (concluding harassment claims of receptionist and secretary did not require court to intrude on the "spiritual functions" of a church).

The district court correctly determined that as principal of St. Joseph School, Konchar was a "minister within the meaning of the ministerial exception." And the majority aptly recognizes Konchar's role as a spiritual leader running that school as a faith community. The Illinois Supreme Court opinion in *Rehfield v. Diocese of Joliet*, 182 N.E.3d 123, is instructive. In that case, the

court looked not to the title of the position ("lay principal"), but to its duties, including "the spiritual and religious education, development and growth of all pupils and staff in the principles of the Roman Catholic faith, as well as the students' and staff's adherence to those same Roman Catholic principles." *Id.* at 141. Those duties qualified Rehfield as a minister. *Id.* at 142. As such, the court did not inquire into the motivation for the diocese's actions that led to her claim—if the ministerial exception applies, the claims are dismissed. *See id.* at 134 ("If . . . the ministerial exception applies to plaintiff's whistleblower claim, the trial court's dismissal . . . should be affirmed."). The same reasoning applies to Konchar.

The corollary of this rule is that the ministerial exception extends to all issues arising out of the employment of the minister and not just to the hiring or firing itself. This includes tort claims—such as Konchar's defamation claim—arising out of the termination of a minister's employment. *See, e.g., Starkey*, 41 F.4th at 944–45 (dismissing state law tortious interference claims); *Hyman v. Rosenbaum Yeshiva of N. Jersey*, 289 A.3d 826, 838 (N.J. Super. Ct. App. Div. 2023) (affirming summary judgment under ministerial exception to dismiss teacher's defamation claim). The key is that the claim must be "part and parcel" of the employment decision to fall within the ministerial exception. *See Hyman*, 289 A.3d at 838; *Sumner*, 238 Cal. Rptr. 3d at 222; *Gunn*, 84 Cal. Rptr. 3d at 9.

There is no doubt that Father Pins's communication to the families of St. Joseph School "is 'part and parcel' " of the decision to terminate Konchar's employment. *See Hyman*, 289 A.3d at 829–30, 838 (sending an email to parents

explaining why a teacher had been fired was "part and parcel" of the decision to terminate him); *Gunn*, 84 Cal. Rptr. 3d at 9 (explaining to the congregation why a worship director had been fired was "part and parcel" of his termination). Indeed, it would have been irresponsible not to alert parents of the change in leadership for their children. It is further part and parcel of the decision that Father Pins would explain to the parents the counsel he had taken to reach his decision. Thus, his "two pastors" comment arises out of the employment dispute.

We have not yet formally applied the ministerial exception. So far, we have applied only the ecclesiastical abstention doctrine, under which courts "may not determine the correctness of interpretations of canonical text or some decisions relating to government of the religious polity." *Rehfield*, 182 N.E.3d at 134 (quoting *Duncan v. Peterson*, 947 N.E.2d 305, 312 (Ill. App. Ct. 2010)); *see, e.g.*, *Koster v. Harvest Bible Chapel-Quad Cities*, 959 N.W.2d 680, 690–91 (Iowa 2021) (declining to "interpret [church] doctrine and practices"); *cf. Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 713–14 (1976) (declining to pry into a dispute "strictly and purely ecclesiastical in its character, a matter over which the civil courts exercise no jurisdiction, in a matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them" (quoting *Watson v. Jones*, 80 U.S. 679, 733 (1871)). The ecclesiastical abstention doctrine is separate from the ministerial exception in that the former considers the "character" of the dispute, but the latter does not. *Compare Milivojevich*, 426 U.S. at 713–14 (accounting for the "character" of the matter),

*with Hosanna-Tabor*, 565 U.S. at 190–95 (examining only the nature of the employment of the minister). Yet the two doctrines are "intertwined." *Rehfield*, 182 N.E.3d at 134. In recognizing the one, we have already recognized the value of the principles underpinning the other.

We have "refuse[d] to interfere with a church's relationship with its ministers." *Pierce v. Iowa–Mo. Conf. of Seventh-Day Adventists*, 534 N.W.2d 425, 427 (Iowa 1995) (per curiam) (affirming summary judgment dismissing claims of "ministerial intern"). This sounds like the ministerial exception, but in reaching our decision, we relied on the ecclesiastical abstention caselaw. *Id.* (citing *Milivojevich*, 426 U.S. at 709). True, we also cited *McClure v. Salvation Army*, but we still examined the "essence" of the termination and determined that it was strictly ecclesiastical. *Id.* This is the application of ecclesiastical abstention.

Closer to the heartland of the ministerial exception, we have affirmed summary judgment dismissing a defamation claim on qualified privilege grounds where the claim stemmed from statements made only to a church community and one person who retained close ties to that community. *See Koster*, 959 N.W.2d at 693. We also affirmed summary judgment dismissing a breach of fiduciary duty claim to avoid interpretation of the church "doctrine and practice." *Id.* at 690–91. We relied in part on our hands-off approach in *Bandstra v. Covenant Reformed Church*: "The means by which [the church official] chose to counsel and advise the congregation is outside the purview of the government." *Id.* at 687 (quoting *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 41

(Iowa 2018)). The plaintiffs in *Koster* and *Bandstra* were parishioners—not ministers—so we did not apply or even mention the ministerial exception.

In my view, the ecclesiastical abstention doctrine inadequately protects the religious freedom of our churches and parochial schools. Church leaders should be able to decide who ministers to their faithful and who runs their religious schools without state interference or entanglement in our court system. *See Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (applying ministerial exception to spare church officials from "subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church in the selection of its ministers"). We should apply the ministerial exception so that cases like Konchar's can be dismissed on the pleadings without protracted litigation. "Summary judgment is an important procedure in . . . immunity cases because a key purpose of the immunity is to avoid costly litigation, and that . . . goal is thwarted when claims subject to immunity proceed to trial." *Nelson v. Lindaman*, 867 N.W.2d 1, 7 (Iowa 2015).

Allowing a case like Konchar's to proceed to trial defeats the purpose of the ministerial exception. *Heard v. Johnson*, 810 A.2d 871, 876–77 (D.C. 2002). It is only "early in litigation" that courts can "avoid excessive entanglement in church matters." *Bryce v. Episcopal Church in the Diocese of Colo.*, 289 F.3d 648, 654 n.1 (10th Cir. 2002). Here, claims that should have been dismissed early instead survived summary judgment and proceeded to a multi-week trial that included testimony of a Roman Catholic Bishop, a monsignor, two priests, the

chancellor for the Diocese, and a canon law expert. The ministerial exception avoids such protracted litigation that itself unconstitutionally infringes on ecclesiastical matters. *See NLRB v. Cath. Bishop of Chi.*, 440 U.S. 490, 502 (1979) (observing "the very process of inquiry" risks violating the First Amendment); *Skrzypczak v. Roman Cath. Diocese of Tulsa*, 611 F.3d 1238, 1245 (10th Cir. 2010) (stating that merely investigating Title VII claims brought by a minister would be antithetical to the First Amendment); *Kirby*, 426 S.W.3d at 609 (cautioning that subjecting religious institutions to discovery and trial risks "constitutional injury").

Churches are not above the law. *See Rayburn*, 772 F.2d at 1171. But the First Amendment grants them broad leeway to hire and fire their own ministers, including the spiritual leader of this parochial school. These defendants' costly entanglement with civil litigation in this case should have been avoided under the ministerial exception.

With these additional reasons, I join in full the majority opinion affirming the district court judgments.

McDermott, J., joins this concurrence.